ODOM, Justice.
 

 This is a suit to collect damages alleged to have been sustained by plaintiff as the result of the destruction, or “killing”, by defendant of a producing oil well owned
 
 *901
 
 by plaintiff, known as “Parro No. 1”, in the Parish of St. Mary.
 

 It appears from the record that plaintiff’s well was drilled to a depth of approximately 6000 feet and was bottomed in oil and gas producing sand, and produced gas first and then oil. Plaintiff’s complaint, as disclosed by its pleadings, is that, after its well was completed as a producer, the defendant drilled a well, known as “Parro No. 4”, 333 feet, measured on the surface, from plaintiff’s well, or only 33 feet from the line of the property set apart to plaintiff for the location and drilling of its well, and that defendant’s well is bottomed so close to the bottom of plaintiff’s well that plaintiff’s well was killed or destroyed as a result of the drilling of defendant’s well; that defendant’s well was drilled at an angle from a vertical or upright line, causing it to pass into and through, anfl have its bottom in, property from which plaintiff alone had the right to extract gas and oil, and that defendant is guilty of a tortious subsurface trespass, which renders it liable for the damage resulting from the destruction of plaintiff’s well.
 

 The record shows that in the year 1939 the defendant, Fifteen Oil Company, held and owned a mineral lease covering a tract of land in St. Mary Parish, granted by Dolph Parro to Roy B. Siler in 1932, and that the defendant company, had the right under the terms of the lease “to transfer and assign either in whole or in part, the rights granted it thereunder”, and that on September 21, 1939, the defendant entered into a contract with William A. Brown, reciting that the “Fifteen Oil Company does hereby grant, convey, transfer and assign to the said William A. Brown, the right to drill one (1) well for oil, gas and other minerals on the aforesaid land [the location of the well being specified], with the understanding that, with respect to the said one (1) well, the said Brown shall succeed to all of the rights accorded to the lessee in the aforesaid lease only, however, as to said well location, together with the rights of ingress thereto and egress therefrom, and the right to construct mud pits, drill water well for boiler purposes, erect derrick”, and, generally, the right to do all things necessary in connection with the drilling of the well. (The above quotation is from the contract, a certified copy of which is attached to plaintiff’s original petition.)
 

 The contract further provides that, if a well producing minerals in commercial quantities should be brought in by Brown under the agreement,
 
 “then, that the said Fifteen Oil Company will not drill any well within a distance of three hundred (300') feet of the said well as long as minerals are produced therefrom or work-over or deepening operations are being conducted by the said Brown, his heirs or
 
 assigns(Italics are the writer’s.) The contract further provides that the Fifteen Oil Company “does not intend hereby to assign said lease as to any specified area or number of acres, but intends to grant unto Brown the right to drill one (1) well at the location above described”, and that no part of the expense of drilling the well is to be borne by the Fifteen Oil Company, and that “it shall have no proprietary
 
 *903
 
 ownership in said well or the production therefrom”.
 

 Brown availed himself of the privilege granted in the.contract and drilled a well which was completed as a producer in December, 1939. On January 15, 1940, Brown transferred the well and all his rights under the contract to the Franklin Petroleum Corporation, the plaintiff in this suit.
 

 Subsequently, the Fifteen Oil Company drilled a well located 333 feet on the surface from the Brown or Franklin well, or 33 feet beyond the 300-foot limit specified in the contract. By locating the well where it did, defendant did not violate its contract, and there was no surface trespass. But it did make its location as near to the 300-foot limit as it could without encroaching upon plaintiff’s territory.
 

 Plaintiff alleged that, under the rules and regulations of the Conservation Department of Louisiana, “drilling operations within 150 feet of land, on which the operator has no right to drill are prohibited unless the operator agrees in advance in writing, to survey the hole during the course of drilling to guard against bottom-hole trespass; your petitioner avers on information and belief that the Fifteen Oil Company is familiar with said regulations. * * * that the top of said Parro No. 4 is only 333 feet from the said location, or only 33 feet from the prohibited area, and your petitioner shows that the Fifteen Oil Company failed to survey the hole during the course of the drilling, in violation of. the aforesaid regulation of the Conservation Commission”.
 

 It is conceded that during drilling operations some oil and gas wells drilled normally — i. e., without effort to direct their downward course — drift or deviate from a vertical or upright line, and that it frequently happens that a well located on the surface of the owner’s land near to his property line deviates or swings so far away from the vertical that it passes through, and is bottomed in, his neighbor’s property. When this happens, there is á “subsurface trespass”, whether the deviation is normal or whether it is brought about by intentional controlled directional drilling. Any unlawful physical invasion of the property of another is a trespass.
 

 Plaintiff alleged on information and belief that defendant’s well is bottomed in plaintiff’s land and in the same sand to which plaintiff had drilled and in which it had bottomed its well. Plaintiff alleged in its third supplemental petition that its well was bottomed beneath the surface of the ground allotted to it for the drilling of its well, which was completed as a producer; .in other words, that its well was drilled through, and bottomed in, its own land.
 

 Plaintiff does not own the fugitive minerals, such as oil and gas, which are in, or which may pass through, the earth underneath the surface of the small area allotted to it by defendant for the drilling of a well. Under the terms of the contract entered into by and between Brown and the defendant, Brown and his successors were given the exclusive right to extract minerals from the earth beneath the surface of the land enclosed within a circle.
 
 *905
 
 the center of which was to be the well, the circle to have a radius of 300 feet.
 

 We assume that there is now no dissent from the rule established by the jurisprudence of this state, which is in accord with that of other states, that, while the owner of land is not the owner of the fugitive minerals therein, yet he has the exclusive right to explore his land for the production of minerals and to extract therefrom, and reduce to possession and ownership, all such minerals as may be found in the earth beneath the surface of his land.
 

 This necessarily excludes the right of any person to invade the subsurface of his neighbor’s land and to extract therefrom fugacious minerals, such as oil and gas. Such invasion would be a trespass.
 

 Among the numerous pleas and exceptions filed by defendant was an exception of no cause of action. The trial judge saw no merit in this exception and overruled it. His ruling was correct.
 

 Plaintiff alleged in its third supplemental petition that its well was bottomed beneath the surface of the ground allotted to it for the drilling of its well; and alleged in its original petition, and reiterated elsewhere, that the defendant, in drilling it well known as Parro No. 4, has committed a subsurface trespass upon plaintiff’s property; that defendant’s well was bottomed within plaintiff’s territory and so close to the bottom of plaintiff’s well that its well was killed or destroyed as a direct result of such trespass; that, when defendant had drilled its well into the same oil and gas producing sand from which plaintiff’s well was producing, defendant opened its well first as a gas well and permitted 2,500,000 cubic feet of gas to escape from it each day for five consecutive days, and that as a result the gas pressure of plaintiff’s well immediately dropped sharply, and that defendant allowed gas to escape from its well until the Conservation Department ordered the well closed; that, as the result of defendant’s well’s being bottomed close to the bottom of plaintiff’s well, plaintiff’s well “went dead”, and that plaintiff has suffered serious damage. These pleadings set out a cause of action.
 

 Plaintiff filed its suit on September 23, 1941, and on October 18 filed its first supplemental and amended petition. Thereafter, on October 30, plaintiff filed a motion styled: “Motion Filed by Plaintiff for Rule to Show Cause Why the Court Should Not Appoint an Expert to Survey the Defendant’s Well Known as Parro No. 4.” It is alleged in this motion that “a survey of the Fifteen Oil Company’s Parro No. 4 well will show that it is bottomed within 300 feet of the location of Franklin Petroleum Corporation’s well known as Parro No. 1; and on further suggesting and showing unto the Court that such survey can be made without stopping the flow of the well, or damaging it in any way, and that the movers desire that an expert be appointed by the Court to have such a survey made, the expert to be duly sworn”. When this motion was filed, the court ordered “that the Fifteen Oil Company show cause on the 4th. day of November, 1941, at 10:00 A.M. O’clock why this Court should not appoint an expert to survey the
 
 *907
 
 said Defendant’s well known as Parro Number 4, the expert to be sworn”.
 

 On November
 
 4,
 
 the day on which defendant was ordered to show cause, it answered the rule. It did not deny that a survey of its well could be made by experts, which survey would show whether or not the well had been drilled at an angle from the vertical or upright line and, if so, how far it had drifted and in what direction; and did not deny that such survey would show the location' of the bottom of the well. But it denied the right of the court to issue such rule, on the ground (1) that there is no law in the State of Louisiana authorizing the issuance of such rule or the form of such proceeding; (2) in the alternative, that there is no law of this state authorizing the inspection • or examination of defendant’s property, without defendant’s consent, by an expert appointed by the court; (3) .in the alternative, that, should it be held that tile laws of Louisiana authorize the issuance of such rule and the inspection or survey of the property of defendant," such right does not and could not exist in this case for the reason that, in order to appoint an expert, as prayed for by plaintiff, and to allow such inspection and survey, the court would have to consider'and decide the merits of the controversy and the meaning of the contract before hearing the rule, and that said contract and plaintiff’s petition do not show that any such right could exist; (4) in the alternative, that plaintiff has no right in this suit to require such survey, for the reason that the location of the bottom of defendant’s .well can have no evidentiary value in the suit, as any deflection of said well, if it occurred, would not have been in violation of the contract referred to in plaintiff’s petition; (5) in the alternative, that, should it be held that the court is vested with authority to order such survey made and that the evidence which, could be obtained thereby would have evidentiary value in this suit, defendant shows (a) that all wells drilled in search of oil or gas have a natural tendency to deflect from a vertical course to some extent, some to a larger extent than others, unless controlled by directional surveys and special apparatus used for such purpose during the course of drilling; (b) that defendant is informed and believes and therefore alleges that plaintiff, in the drilling of its well, Parro No. 1, by the use of what is termed a “whipstock”, deliberately deflected the course of its well; (c) that, if such information obtained by defendant is in error, the natural tendency of said well would have been to deflect in some direction, and, therefore, if the location of the bottom of defendant’s well, Parro No. 4, is of any evidentiary value in this suit, the location of the bottom of Parro No. 1 would have equal or greater evidentiary value; that for this reason, since plaintiff’s well is not at present producing oil or gas, plaintiff should have its own well surveyed, which could be done without injury or damage thereto, whereas, to survey defendant’s well, which is producing, it would be necessary to kill it, which might result in damage to defendant.
 

 Further, in the alternative, defendant alleged that a survey of its well could not possibly be made so as to locate definitely
 
 *909
 
 its bottom without removing the tubing from the well and without killing it, or stopping the flow of oil from the well, “all with great danger of ruining said well or affecting the character and value thereof”, and that the rule issued herein refers only to the survey of said well “without stopping the flow thereof; and, therefore, no order for the ‘killing’ of defendant’s well, Parro No. 4, could be issued in this proceeding”, and that, should any person pretend to be able to make a directional survey of said well while it is flowing and should any such attempt be made, “the operation would have to be carried on under great pressure and during a long period of time and at great risk to said well and could not, as is well known to those versed in the profession, show with any degree of accuracy the location of the bottom of the well”, and that the cost of such operation would be in excess of $10,000.
 

 Further pleading in the alternative, defendant alleged that, if the court should order the survey made;, it should order at the same time that it be made at the expense of the plaintiff, and that, in order to protect the defendant from all injury which might result from the survey, plaintiff should be ordered to post bond in a sum not less than $100,000.
 

 In connection with defendant’s suggestion that plaintiff should have its own well surveyed, it is proper to state here that plaintiff alleged in its third supplemental petition that “straight hole tests by means of a device known in the oil industry as an acid bottle inclinometer were run during the course of the drilling of the well known as Franklin Petroleum Corporation’s Parro No. 1 referred to in the original petition, and that the results of the tests showed that the well did not at any time deviate more than
 
 iy2
 
 degrees off vertical; and your petitioners show therefore that the said well is bottomed well within 300 feet of said-vertical”.
 

 The trial judge set the rule down for hearing. Testimony of experts was adduced relating to the question whether a survey of a well can be made so as to determine whether it has drifted from thb vertical and, if so, to what extent and in what direction, and whether by means of such survey the bottom of it can be located, and the further question whether, if the well is producing oil, such survey can be made without injury to it. After hearing the testimony, the trial judge ruled that, under the circumstances disclosed, he was not vested with power and authority to appoint experts to survey the well. He recalled the rule, and, being of the opinion that plaintiff had failed to make out its case, rejected its demands and dismissed its suit. From this judgment plaintiff appealed.
 

 The first and main issue involved is whether the court was vested with power and authority to order experts to survey defendant’s well for the purpose of obtaining information which might be helpful to the plaintiff in making out its case. Plaintiff alleged, and this is admitted by defendant, that wells drilled in search of’ oil or gas “have a natural tendency to deflect from a vertical course * * * unless controlled by directional surveys and special apparatus used for such purpose-
 
 *911
 
 during the course of drilling” (quoted from defendant’s answer to the rule). This tendency of wells to deflect from a vertical course is what is generally referred to by
 
 those
 
 engaged in the production of oil and gas as “drifting”. Plaintiff alleged that its well is bottomed beneath the surface ■of the ground allotted to it for the location and drilling of its well. Such allegation was necessary in order to set forth a cause •of action, because, if its well “drifted” and was bottomed outside the territory allotted to plaintiff, it could not recover from defendant even if defendant did kill plaintiff’s well as alleged.
 

 Counsel for defendant argued before the court and state in their brief that, because plaintiff did not prove that its well was bottomed in its own territory and did not prove that its well was producing oil at or about the time defendant’s well was completed and thereafter ceased to produce, its demands should be rejected, even if the court’s ruling that it had no power and authority to appoint experts to survey the well was erroneous.
 

 But this argument overlooks the fact that the case was not tried on its merits; that the court ruled that “the sole issue of this hearing is whether or not the Court will order a survey of defendant’s well, and that issue has limited itself down to the question of whether or not this survey can be done without injury or damage”, and refused to hear testimony relating to any other point. The court informed counsel for plaintiff that it would hear no testimony except that relating to the feasibil-v of making the survey. The court said: “It is clear that the hearing today must be confined to one question alone, and that is whether or not an expert shall be appointed to make a survey of the well in question.”
 

 It is alleged, in substance, that the offending well, Parro No. 4, which was located only 33 feet outside the area set apart to plaintiff for the location and drilling of its well, “drifted” in the direction of, and was bottomed in, plaintiff’s territory. As indicating this, plaintiff alleged that, when defendant’s well was opened and gas in large quantities was permitted to escape therefrom, the gas pressure in plaintiff’s well immediately dropped, or went down, and shortly thereafter its well “went dead”. But testimony supporting this allegation would not show definitely that the defendant is guilty of the alleged trespass upon plaintiff’s property. In order to show the trespass, plaintiff is endeavoring to have defendant’s well surveyed. Plaintiff alleged on information and belief that defendant’s well had drifted in the direction of its well. It is seeking to disclose what it says is a fact, which fact can be established by no method other than a survey of defendant’s well. Defendant does not deny that such survey can be made by experts and that the survey would disclose whether its well had drifted and, if so, in what direction. But defendant says that the court'was not vested with power and authority to appoint an -Xpert to make the survey. Article 442 of ,.ie Code of Practice provides that: “Experts may
 
 J?e
 
 appointed whenever the court deem them necessary in order to ob
 
 *913
 
 tain information, or at the request of parties to the suit.”
 

 The power thus conferred is broad and not restricted.
 

 The court is authorized to appoint experts in any case where it thinks the appointment of them is “necessary in order to obtain information”.
 

 Equally important, if not more so, is Article 130 of the same Code, which reads as follows: “All judges possess the powers necessary for the exercise of their respective jurisdictions, though the same be not expressly given by law.”
 

 The word “jurisdiction”, as used in this article, means “the power of him who has the right of judging” (Code of Practice, Article 76). The Code of Practice prescribes rules to be observed and followed in the trial of civil cases, and the framers of that Code made rules to be observed in disposing of such matters or points as they anticipated might arise during the trial of cases. But they evidently realized that points which they could not foresee might arise during the trial of cases. For that reason they wrote into the Code Article 130, which confers upon judges all such powers as are necessary for the “exercise of their respective jurisdictions, though the same be not expressly given by law”.
 

 Counsel for defendant argue that, because there is no “express law” authorizing the appointment of experts to survey the oil well which defendant owns and which is in its possession, the court is without power to do so. We find no merit in this argument. Article 442 of the Code provides that judges may appoint experts in any case where they think the appointment of them is “necessary in order to obtain information.” The framers of the Code could not have anticipated that it would ever become necessary to survey an oil well in order to obtain such information as might be necessary to enable the court to decide whether one person has committed a subsurface trespass upon the property of another, because in 1870, when the Code was adopted, there was not an oil or gas. well in the State of Louisiana, and naturally no express rule was laid down to cover a case of that kind. But Articles 130 and 442 of the Code take care of such contingencies, Article 130 providing that judges have the power to do what is necessary in order to enable them to “exercise their respective jurisdictions”' properly, though such powers “be not expressly given by law”, and Article 442 providing that the court may appoint experts, whenever it deems them necessary “in order to obtain information.”
 

 Article 21 of the Revised Civil Code reads as follows:
 
 “Equity in Absence of Law.
 
 In all civil matters, where there is no express law, the judge is bound to
 
 proceed and decide
 
 according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent.” (Italics are the writer’s.) See Morris v. Cain, 35 La.Ann. 759.
 

 The function of judges is to administer justice in all cases brought before them. They cannot do ‘justice without knowledge
 
 *615
 
 of the facts on which a litigant grounds his cause of action or his defense.
 

 To say that the law has not conferred upon judges the power to order a search made in cases of this kind for the discovery of evidence which -might aid plaintiff in the prosecution of his cause, or aid the adverse party in making his defense, is tantamount to saying that their power to do justice is limited. But such power is tice. Furthermore, the Revised Civil Code conferred upon them by the Code of Pracconfers upon judges broad and sweeping equity powers in cases where there is no express law to guide them, and “Equity will not suffer a right to be without a remedy.”
 

 This is not a case of “damnum absque injuria”. That is a phrase used to describe a loss arising from' actions or conditions which do not create a ground of legal remedy. (See 11 Words and Phrases, Permanent Edition, Damnum Absque Injuria, page 59.) The acts done by defendant — if it did them — constituted a trespass upon the property of plaintiff, a wrong for which the law provides a remedy. Revised Civil Code, Article 2315.
 

 The well which plaintiff seeks to have surveyed is the property of defendant and in its possession; so that, in a sense, the evidence which plaintiff is seeking is in possession of its adversary. Under our law, either a plaintiff or a defendant may compel his adversary to produce evidence in his possession. Article 140 of the Code of Practice provides that- courts may “decree that the other party bring into court, the books, papers, and other documents which are in his possession, and which are material in the cause.” And Article 473. provides that, “If one of the parties wish to obtain books, papers, or other documents in possession- of the adverse party, the court shall order, on motion of the party applying for the same, that such books, papers, or documents be brought into court and produced on the day fixed for the trial of the cause.”
 

 But counsel for defendant argue that these rules should be strictly construed, and, when so construed, they relate only, to the production of “books, papers, and other documents” in the possession of the adverse party. And apparently in support of this argument they quoted in their brief the following extract from C.J.S., volume 27, § 71, p. 108, verbo, Discovery: “In the absence of specific statutory provision authorizing a party to inspect material within control of his adversary, it has been held that the courts cannot order that this be done, and statutory provisions authorizing the appointment of expert witnesses to examine persons, matters, and things prior to trial have been held not to authorize the making of such an order, particularly where compliance with such order would require invasion of the private premises of a party.”
 

 In support of this text, only one case is cited, that of. O’Reilly v. Superior Court, a Rhode Island case decided in 1924 and reported in 46 R.I. 37, 124 A. 726, 727, 33 A.L.R. 13.
 

 The ruling in that case has no application here.. That case grew out of an action to recover the purchase price of flooring
 
 *917
 
 which had been laid in defendant’s dwelling. In the course of its opinion, the court said: “Plaintiff is seeking to secure evidence, before trial, in aid of an action at law, not primarily, however, to establish its own case. Having furnished and laid the flooring, it presumably has proof’of its right of action.' In effect, it seeks to discover in advance of trial the defense, to the action.”
 

 We have found one case which is on all fours with the one at bar in every respect —a case in which all the points raised here were raised and decided. We refer to the case of Texas Co. v. Hollingsworth, an Illinois case, decided in 1940, reported in 304 Ill.App. 607,
 
 27
 
 N.E.2d 67, 71.
 

 The Texas Company, plaintiff in that case, held leases for the drilling of oil and gas wells on a substantial amount of land. Between the tracts on which the plaintiff .held leases, the defendant held a lease on a small strip of land one-half mile long, 33 feet in width at one end, and 6 feet in width at the other, the average width of the strip being 19 feet. On this strip of land the defendants caused to be drilled nine oil and gas wells. On either side of the strip, as off-set wells, the plaintiff drilled 16 wells. Plaintiff’s complaint was that the wells of the defendants on the strip of land were not bottomed under said strip but, on the contrary, extended beyond the boundary lines of said strip and into land which was leased by the plaintiff, and that thereby the wells of defendants were producing oil which was not under the strip of land owned by defendants but from the land on either side owned by the plaintiff. It was alleged that ’ defendants’ wells were made by the use of rotary drills, and that by that means it was almost impossible to sink them straight down to the horizons which were producing in that locality but that they would vary in different degrees as they were lowered. The complaint alleged that because of these facts irreparable injury was being. wrought against plaintiff and that it had no remedy except in a court of equity; and plaintiff prayed that the defendants be enjoined from carrying forward operations which plaintiff alleged were to its irreparable injury. The plaintiff, after alleging these facts, prayed for a subsurface directional survey of the nine oil and gas wells owned by the defendants, on the ground that its only means of finding out the truth about this situation was to have a directional survey of the wells made.
 

 Attached to plaintiff’s petition were the affidavits of three experts, setting out that there was a scientific method by which subsurface directional surveys could be made, and that such surveys could be made without necessarily injuring the wells. •
 

 The trial court dismissed plaintiff’s complaint for want of equity. The judgment was reversed on appeal, and the lower court was ordered to have the survey made under its direction, “after exacting from petitioner ample safeguard for the protection of defendants’ rights and their security”.
 

 We learn from the decision in that case that the “discovery section” of the Illinois Practice Act (Illinois Revised Statutes 1939, Chapter 110, § 259.17) is very simi
 
 *919
 
 lar to our rules of procedure on the same subject. The Illinois statute provides that: “Any party may, without filing an affidavit by motion seasonably made, * * * apply for an order directing any other party to any cause or matter to file a sworn list of all the documents, including photographs, books, accounts, letters and other papers, which are, or which have been, in his possession or power, material to the merits of the matter in question in said cause.”
 

 After quoting the above rule, the Illinois court said: “If, before issue joined, a banker may be ordered to bring his books into court for the inspection of the other party, or all manner of information obtained in hundreds of cases which come before courts in virtue of this section, why may not the court without joinder of issue hear and determine where truth that is undisclosed lies when the only power of disclosure rests in the power of the court. We think the cases are analogous and that the court did not err in hearing the petition for the survey upon notice to the defendants.”
 

 The discovery section of the Illinois Practice Act,' according to the quotation thereof found in this case, made no specific mention of an examination or. survey of an oil well in order to discover facts Avhich might be useful to the plaintiff in proving its case, but the court held, and, Ave think, correctly, that, if before issue joined a bank may be ordered to bring its books into court to be there exhibited in evidence, there could be no reason why the plaintiff should not be permitted to have a survey.made of defendant’s oil well under the direction of the court.
 

 In California, where great quantities of oil are produced annually, it is common practice for the courts, in order to do justice, to order surveys made of oil wells for the purpose of discovering the facts, in cases where one landowner or lessee alleges that another person has committed a subsurface trespass upon his property.
 

 In the case of Union Oil Co. v. Reconstruction Oil Co., 4 Cal.2d 541, 51 P.2d 81, 82, the complaint was that defendant had committed such a trespass. The trial court on motion of plaintiff ordered a survey made of defendant’s well, which was done, and on trial of the case the results of the survey were received and filed in evidence over defendant’s objection. The defendant appealed, and the appellee moved to dismiss the appeal on the ground (1) that no appeal lies from such order, and. (2) that all questions involved in the appeal had become moot. The appellate court dismissed the appeal because “Orders authorizing plaintiff to make subsurvey of defendant’s oil well to determine whether ‘ well had been ‘bottomed’ in territory underlying surface of plaintiff’s leasehold, and empowering qualified experts to make examination, and prohibiting defendant from interfering with carrying out of orders” were not appealable since they were not final judgments.
 

 In that case, the court in the course of its opinion said: “By certain equipment familiar to the oil industry, these experts were to determine to what extent said well deviated from the perpendicular and in
 
 *921
 
 what direction. The information thus obtained would obviously be of great value to the plaintiff in establishing as a fact that defendants were trespassing upon its territory and unlawfully taking oil therefrom. * * * The orders herein involved, on the contrary, are important and essential to the correct determination of the main issue, that is to say, the question of the trespass of the appellants and the misappropriation of oil from respondent’s land, and were made as a necessary step to that end. They were made in the exercise of the inherent power of the court to compel the furnishing of evidence in a civil action by one adverse party upon the proper application of the other party.”
 

 In another California case, Alphonzo E. Bell Corporation v. Bell View Oil Syndicate, decided in 1938, 24 Cal.App.2d 587, 76 P.2d 167, the plaintiff sued defendant for the value of oil obtained through subsurface trespass and to enjoin it from further trespassing. In that case, a directional survey of defendant’s well was made. The question whether the court had power to order such survey was not made an issue in that case. We cite the case only to show that it is common practice in that state to make such surveys.
 

 In Summers on Oil & Gas, Permanent Edition, volume I, § 26, the following comment appears under the topic “Trespass by Crooked Well — Survey of Wells”:
 

 “A landowner or oil and gas lessee is legally privileged as against landowners or lessees of adjoining or nearby lands, subject to certain statutory restrictions, to drill oil or gas wells on his land to any depth and to take oil or gas therefrom as long as the well is bottomed beneath the surface of his own land, although some of the oil or gas taken may be drawn from beneath the lands of adjacent owners. If, however, the well deviates the vertical to such an extent as to penetrate the producing formation beneath the land of an adjacent owner, it has been held in recent California cases that the act constitutes trespass and the damages are measured by the amount of oil or gas taken from the well. It was also held that all persons injured by such trespass, lessees and royalty owners, are proper parties to a suit for injunction and damages and that because of the secret nature of the trespass the statute of limitations did not begin to run until its discovery.
 

 “For a number of years it has been known that oil and gas wells divert from the vertical. This may result from the character of the formation encountered in drilling, the type of drilling machinery used or the lack of care and skill of the driller. With present day drilling equip ment and methods of survey, wells may be intentionally drilled so as to deviate in a desired direction from the vertical. Not many years ago a distinguished petroleum geologist declared that ‘in the oil industry, the problem of crooked holes is second in importance only to the problem of overproduction’. At this time, however, instruments for the survey of wells disclosed only the fact of deviation from the vertical without indicating the direction of the deviation. Instruments have now been devised by which both the extent and the direction of the deviation are indicated so
 
 *923
 
 that it may be known where a well penetrates the producing formation. In some states the regulations of conservation agencies require that directional surveys of wells be made and that records thereof be preserved. With such available information a landowner or lessee may learn if his land has been subject to subsurface trespass by adjoining owners.”
 

 The following quotation is from 9 R.C. L., verbo “Discovery”, Section 2, p. 164: “The power to enforce discovery is one of the original and inherent powers of the court of equity. In fact, every bill for equitable relief is, in a measure, a bill for discovery and relief, or it can be made such if the plaintiff chooses, as it is a general principle that a party having an equitable claim has a right to a discovery under oath from the adverse party, and to have all ' the proofs on which his claim depends taken in due form, and submitted to the decision of a court of equity.”
 

 In the John Marshall Law Quarterly, Volume V, beginning at page 30, is an article written by Mr. Mortimer Kline of the California Bar. The writer discusses the problems which confronted the oil industry of California a few years ago, and refers especially to the practice of “whip-stocking” or “crooked hole” drilling, by which is meant “controlled directional drilling resulting in the completion of an oil well with its producing interval within and producing from the property of a neighbor”. He discusses the matter of surveys as practiced in California and elsewhere. Of interest also is an article in 16 Texas Law Review, page 544.
 

 The testimony taken in this case on the trial of the rule to show cause shows that defendant’s well can be directionally surveyed by experts, and that the location of the bottom of it can be so established with a great degree of accuracy. Counsel for defendant concede this, but in their pleadings they raised the issue, which was argued orally before this court, that in order to make the survey it will be necessary first to kill defendant’s well, and that, if it is killed, there is a probability that it could not be revived, and that, even if it could be revived, it might not be as valuable a producer as it is now, in either of which events defendant would suffer loss and damage.
 

 In California and in Illinois, as. shown by the cases which we have cited and reviewed, while the courts invariably order surveys made in cases of this kind,, their orders stipulate they they are to become effective only upon plaintiffs’ providing ample safeguards for the protection, of defendants’ rights and their security. Of course, a defendant who is required to> surrender his well for the purpose of having it surveyed by experts appointed by the court is entitled to protection against such loss and damage as may reasonably be expected to result from such survey.
 

 The trial judge said in the course of his. written opinion that he was “mindful of' the strong equities revealed by plaintiff’s allegations”, and that, although courts do. have authority in some cases to appoint experts to obtain information, yet, because he was convinced that in the making of the survey "three main operations” would be involved, he was of the opinion that ex
 
 *925
 
 perts should not be appointed in this case. The judge seems to have thought that three experts would be necessary, for, speaking of these operations, he said: “The first is the readying of the well for the survey. Be it done by killing the well or under pressure, this step must be accomplished. The .second is to make the survey to ascertain the deflection, if any, of the hole. And the third is the restoration of apparatus to their former position. As this work must be done by those having the mechanisms necessary therefor, it is seen that they must be specially employed for the purpose.”
 

 The testimony shows that experts who survey wells do nothing but make the surveys; that they will not begin their work until the wells are made ready. But it does not show that the court would have to appoint more than the one expert who would survey the well. Counsel for defendant called Mr. L. F. Statton as a witness and asked him whether he was connected with the Arrow Drilling Company. He said that he was division manager of that company, that the company had drilled defendant’s well, and fhat he was familiar with it. He was asked whether he had given .consideration to the operations that would be necessary in the making of a.directional survey of the well and to the cost thereof, and he said he had. He was asked: “What is the estimated cost according to your investigation for the killing of the well, removing the tubing and then attempting to recomplete it without regard to the cost of the survey itself?” His reply was: “My estimate will run approximately $6000.00 which costs include a drilling derrick up and down three days, rig up six days, mixing mud, killing well, pulling the tubing, running one directional survey, recompleting well two days, tearing down, and I might add that in the numerous Company jobs such as this, we put the rigging up and tear it down, that is what we call A.P.I.”
 

 We understand that neither the Arrow Drilling . Company, represented by Mr. Statton, nor Mr. Statton himself, is engaged in the business of surveying wells, but that his company does; or will contract to do, everything else connected with surveys, including the recompleting of the well. So the only''expert the court would have to appoint would be one to make the survey. Everything else connected with, or incidental to, the making of the survey could be done by contractor.
 

 Counsel for defendant say in their brief at page 31: “The thing here in which defendant has an interest is its own particular well known as Parro No. 4 and the question is whether it could or should be surveyed against its wishes and at its risk by parties appointed by the Court.”
 

 - It is true that, if the survey is made, it will be made against the wishes of defendant, and its property will have to be temporarily invaded for that purpose; but, as was said in the case of Montana Co. v. St. Louis Min. & Mill Co., 152 U.S. 160, 14 S.Ct. 506, 508, 38 L.Ed. 398: “To ‘establish justice’ is one of the objects of all social organizations, as well as one of the declared purposes of the federal constitution; and if, to determine the exact measure of the rights 'of parties, it is neces
 
 *927
 
 sary that a temporary invasion of the possession of either for purposes of inspection be had, surely the lesser evil of a temporary invasion of one’s possession should yield to the higher good of establishing justice; and any measures or proceedings which, having the sanction of law, provide for such temporary invasion with the least injury and inconvenience, should not be obnoxious to the charge of not being due process of law.”
 

 If the survey is made, it will be made not at the risk of defendant, but at the risk of plaintiff, who must pay all costs thereof and provide .ample safeguard to protect defendant’s rights.
 

 We think the trial judge erred in his ruling that, under the circumstances disclosed, he was not authorized to appoint an expert to survey the well.
 

 The judge overruled defendant’s exception of no cause of action. That ruling was correct. In commenting on that point, we have pointed out that plaintiff alleged that its well was bottomed in its own territory, and have stated that it was necessary for plaintiff to make that allegation
 
 in
 
 order to set out a cause of action. The reason is obvious. Plaintiff’s allegation in its third supplemental petition shows that its well did “drift” from vertical but not out of the boundaries of its own territory. In order to make out its case, plaintiff must prove primarily that it has not invaded its neighbor’s property, for, if it has done that, it has no case.
 

 Counsel for defendant raised that point in their pleadings, and it is well founded. They now argue that, because plaintiff did not prove its allegations relating to this point, its demand should now be rejected, and its suit dismissed. But, as we have shown, the judge refused to hear any testimony except such as was pertinent to the question whether he should order defendant’s well surveyed and appoint an expert for that purpose. Plaintiff, therefore, should not be condemned because such proof is not in the record.
 

 The judgment appealed from is erroneous and must be set aside, and the case remanded for trial on its merits. Since, in order to recover, plaintiff must prove that its well is bottomed in its own territory, that point should be heard and decided first, because, if plaintiff fails to make out its case on that point, no further proceedings need be had. The information disclosed by a survey of defendant’s well, however favorable to plaintiff’s case it might be, would be of no avail to it if it fails to prove this first point. A judgment adverse to plaintiff’s contention on this first point would necessarily dispose of the case.
 

 For the reasons assigned, the judgment appealed from is set aside, and the case ,is remanded to be tried on its merits in the manner and according to the views herein expressed; and, if judgment is rendered in favor of plaintiff, holding that plaintiff’s well is bottomed in its own territory, then the court is directed to order a survey made of defendant’s well, known as Parro No. 4, and to appoint an expert to make the survey under its direction, such order to provide specifically that it shall not become effective unless and until the plaintiff posts bond, with sureties to be approved
 
 *929
 
 by the court, in an amount which the court may deem sufficient to cover the costs of making the survey and all costs incidental to or connected therewith, including the cost of reviving the well in case it is killed, and sufficient to protect defendant against such loss or damage as the court may think is reasonably to be expected to result from the survey; the findings of the expert, as shown by his proces verbal, are to be sub- „ mitted to the court, to be used and filed in evidence by either plaintiff or defendant. Costs of this appeal are to be paid by the appellee; all other costs to await results.
 

 O’NEILL, C. J., recused.