## GLIPTIS v. UNITED STATES.
### Civ. A. No. 1083.

United States District Court
S. D. Alabama, S. D.
April 7, 1954.

**4**

Thomas E. Twitty and John W. McConnell, Jr., of Inge, Twitty, Armbrecht & Jackson, Mobile, Ala., for plaintiff.

Donald P. Hertzog, Sp. Asst. to the Atty. Gen., and Percy C. Fountain, U. S. Atty., Mobile, Ala., for defendant.

THOMAS, District Judge.

This is a suit under the Tucker Act, 28 U.S.C.A. §§ 1346, 2401, 2402, against the United States to recover an alleged overpayment of income taxes for the calendar years 1945, 1946, and 1947. There are two issues in the case. The first issue concerns the question of the year in which certain corporate stock held by the plaintiff became worthless. That issue will be considered first.

### Findings of Fact on First Issue

The government takes the position that the stock became worthless in the year 1941. The plaintiff contends that the stock became worthless in the year 1945. The corporation was a Louisiana corporation known as Franklin Petroleum Corporation, which was organized in January 1940, for the purpose of exploiting an oil well, known as Parro No. 1 Well, and organizing the development of other wells and the exploitation of oil and mineral leases. This venture soon proved to be non-profitable; and, in October 1940, the corporation was placed in voluntary receivership. The plaintiff taxpayer, who was then a substantial stockholder in the corporation and one of its directors, was appointed receiver. The receivership was an active one. With court approval, the plaintiff, as receiver, in November 1940, entered into an agreement with one Richards,

looking to the restoration of the production of Parro No. 1 Well; and again, in March 1941, the plaintiff, as receiver and with court approval, entered into a second agreement for the same purpose. The second effort to produce oil was successful, and the well was in production from May 1941 until September 1941. When the production ceased, there was an active dispute between the plaintiff, as receiver, and a concern known as Fifteen Oil Company, holders of oil rights on the adjacent leasehold, as to whether production from Parro No. 1 Well ceased on account of alleged sub-surface interference by a well drilled on that adjacent leasehold by the latter company. With court approval, plaintiff, as receiver, filed in September 1941, against Fifteen Oil Company, a suit in which some $500,000 damages and title to, or proceeds from, oil produced by the Fifteen Oil Company well were claimed because of the alleged interference with the production from Parro No. 1 Well. In order to further the interest of the receivership and prosecute said litigation, the plaintiff, as receiver, moved the court for authority to appoint experts to survey the well to determine whether or not there had been sub-surface interference by the defendant in that case. This motion was strenuously resisted; and protracted litigation ensued therefrom, which resulted in opinion by the Louisiana Supreme Court in January of 1944, Gliptis v. Fifteen Oil Co., 204 La. 896, 16 So. 2d 471, holding that the motion should have been granted on condition that the receiver furnish a substantial bond to protect the adjacent property owners from any damage on account of such survey. Negotiations were carried on between the plaintiff, as receiver, and the defendant in that case, looking toward settlement of the litigation; and a petition was filed in August 1945, by the taxpayer as receiver, seeking authority to enter into a settlement, which culminated in a settlement in September 1945, in the amount of $22,500, paid to the plaintiff as receiver. During this period the expenses of the corporation were met

by advances made to the corporation by the plaintiff. In December 1945, the plaintiff as receiver presented to the court of his appointment his first provisional account, under which the proceeds of said settlement, or practically all of such proceeds, were paid out to creditors of the corporation, leaving nothing for the stockholders. The receivership continued until September 1947, when the plaintiff was discharged as receiver.

The government contends that the corporate stock of Franklin Petroleum Corporation became worthless in the year 1941. The plaintiff contends that the corporate stock became worthless in the year 1945, when the litigation against Fifteen Oil Company was finally disposed of and it was determined for the first time that the assets of the corporation, consisting primarily of said sum of $22,500, were not sufficient to pay its debts and therefore the capital stock of the corporation had no value.

#### Conclusion of Law on First Issue

The court concludes from the evidence in this case that the capital stock of Franklin Petroleum Corporation became worthless in the calendar year 1945, and the plaintiff taxpayer properly so treated the matter. Williamson Milling Co., 5 B.T.A. 814; Otto T. Mallery, 1943 P-H T.C. Memo Decisions 43,169; James L. Byrd, 21 B.T.A. 1183; Edward C. Lawson, 42 B.T.A. 1103; Rassieur v. Commissioner of Internal Revenue, 8 Cir., 129 F.2d 820; Smith v. Helvering, 78 U.S.App.D.C. 342, 141 F.2d 529; Benjamin v. Commissioner of Internal Revenue, 2 Cir., 70 F.2d 719; Hanna Iron Ore Co. of Delaware, 1943 P-H T.C. Memo Decisions 43,526; Dunbar v. Commissioner of Internal Revenue, 7 Cir., 119 F.2d 367; Walter E. Templeman, 20 B.T.A. 493.

#### Findings of Fact on Second Issue

The second issue in this case involves the question of whether a bad debt loss sustained by the plaintiff taxpayer in the year 1946 was a business debt or a non-business debt within the meaning of Section 23(k) of the Internal Revenue Code. 26 U.S.C.A. § 23(k).

Some of the essential facts in connection with the plaintiff's business venture have already been alluded to above. Plaintiff's entry into the oil fields of Louisiana was brought about by his becoming acquainted in 1939 with one William A. Brown, who at that time owned a leasehold interest in the Chareton Oil Fields in St. Mary's Parish, Louisiana. In 1939, the plaintiff purchased a share of the Brown leasehold interest for the sum of $5,000. When the Franklin Petroleum Corporation was organized in 1940, Brown was the President and a director; but the plaintiff, under the evidence, was the chief contributing stockholder. The corporation was primarily interested in making a better well out of Parro No. 1, which was already producing. But Brown's lease of adjacent lands required the drilling of other wells; and there again the plaintiff furnished the capital by lending Brown, in the year 1939, the sum of $12,000, used by Brown to drill the second well, which turned out to be a "dry hole". In 1946, after the settlemen of the litigation against the Fifteen Oil Company, the plaintiff settled the debt owed to him by Brown, which was evidenced by a promissory note, for the sum of $1,000, and charged the remaining $11,000 off on his income tax return for that year as a business bad debt.

The government takes the position in this case that the loan to Brown was a contribution to the capital of Franklin Petroleum Corporation, because the proceeds of the loan were intended to be used and were used in the development of the second oil well, which, although held by Brown, inured directly to the benefit of the corporation; and further because it was contemplated by the taxpayer and Brown that the note be repaid out of profits to be derived by Brown from the oil ventures in which both the taxpayer and Brown were then engaged. This position of the government is untenable, however, because the taxpayer did not contribute the $12,000 to the corpora-

tion; instead, the taxpayer lent Brown $12,000, and the loan was evidenced by a negotiable promissory note executed by Brown, and not by the corporation.

Next, the government contends that the loan to Brown was a nonbusiness loan and that the taxpayer was not engaged in the loan business at the time the loan was made or at the time the debt was declared worthless. The government stresses that during this time the taxpayer was engaged in the operation of a restaurant, known as the Royal Cafe, in Mobile, Alabama. The government also contends that the business of the Franklin Petroleum Corporation was not the same as that of its officers, directors, and stockholders.

The question of whether or not a person is engaged in a trade or business within the meaning of Section 23 of the Internal Revenue Code is a factual one. In the case of Foss v. Commissioner of Internal Revenue, 1 Cir., 75 F.2d 326, 328, it was said: "The line comes between those who take the position of passive investors, doing only what is necessary from an investment point of view, and those who associate themselves actively in the enterprises in which they are financially interested and devote a substantial part of their time to that work as a matter of business."

It is well recognized by the courts that a taxpayer can be, and often is, in more than one business. Snyder v. Commissioner of Internal Revenue, 295 U.S. 134, 55 S.Ct. 737, 79 L.Ed. 1351. See also Dunlap v. Oldham Lumber Co., 5 Cir., 178 F.2d 781, wherein the court, in an opinion by Judge Russell, pointed out that a trade or business need not be a taxpayer's sole occupation nor take all of his time.

The government relies heavily on the decision of the Court of Appeals for the Fifth Circuit in the case of Campbell v. Walker, 208 F.2d 457, and Thomas v. Obenchain, 5 Cir., 185 F.2d 455. But in comparing the factual situation involved in the Walker and Obenchain cases on the one hand with what we have involved here, I conclude that the cases relied upon do not fit the pattern of evidence in this case. In Campbell v. Walker, the taxpayer, Mrs. Walker, was a lady, about seventy-five years old, whose husband had died in the year 1929, and left an estate in excess of $1,000,000 in value, much of which consisted of accounts and notes receivable. In 1926, Mr. Walker had loaned $75,000 to one Thompson. No payments had been made on that debt until the year 1948, when his widow, the taxpayer, settled the Thompson note for $9,000 and charged the loss off as a worthless business bad debt. It is true that in the intervening years the management of the Walker estate required an office and a full-time secretary; but the taxpayer, who was an elderly lady, took no part in the management of her affairs and knew nothing about the details of the case and did not testify in the case. It is easy to see that she was not engaged in any business, and apparently she had never had any business training or experience and had never engaged in any business in her life, her activity always being restricted to looking after her extensive investments through the medium of agents. The facts in the Obenchain case were essentially the same as in the Walker case. There Mrs. Goodwin, a lady who apparently had never engaged in any business and had never had any business training or experience, was simply preserving the estate left to her by her deceased husband.

I find from the evidence in this case that, although the taxpayer, George Gliptis, owned and was in charge of the operation of a restaurant in Mobile, he definitely and actively entered the oil business in Louisiana in late 1939 or early 1940. He not only financed the corporate venture, but the other venture of Brown and himself, as well as other oil ventures during this period (in one of which ventures he testified that he lost over $10,000). From the start he was a principal stockholder of the corporation and a director thereof. He actively negotiated leases and transactions in connection with the business; and when

production ceased and financial difficulties ensued, he became receiver of the corporation, actively managing the affairs of the corporation under supervision of the court of his appointment. His testimony was that he spent substantial time in Louisiana in pursuit of the oil ventures, trying to restore production and handling the protracted dispute with the Fifteen Oil Company. I cannot escape the conclusion also that once the taxpayer entered that business actively and the financial and legal difficulties arose therein, he was inextricably in it until the business ventures were completely liquidated and he was discharged as receiver in 1947. The government in this case stresses the fact that it was understood between Gliptis and Brown that the debt from Brown to Gliptis would be repaid out of profits to be received in the oil ventures mentioned.

Conclusion of Law on Second Issue

Such evidence points up and emphasizes the relation which the loss resulting to the taxpayer from the worthlessness of Brown's debt to him bore to the taxpayer's trade or business. Treasury Regulation 111, Section 29.23–6, expressly provides that if the relationship between the loss and the taxpayer's trade or business is proximate, then the debt is a business bad debt rather than a nonbusiness bad debt. Quoting from the Regulation, we find the following illustration:

"To illustrate: A, an individual engaged in the grocery business and who makes his income tax returns on the calendar year basis, extends credit on an open account to B in 1941. * * *

"(6) In 1942, A, in liquidating the business, attempts to collect B's claim, but finds that it has become worthless. A's loss is not controlled by the non-business debt provisions, since a loss incurred in liquidating a trade or business is a proximate incident to the conduct thereof."

See the case of Maloney v. Spencer, 9 Cir., 172 F.2d 638, and the cases therein cited.

Giving due consideration to the evidence in this case and to the legislative history and purpose of Section 23(k) of the Internal Revenue Code, a fair and just result can only be reached here by concluding that the taxpayer properly deducted the loss on the Brown debt in 1946 as a business bad debt.

A judgment in accordance herewith has been rendered for the plaintiff.