488 So.2d 955 (1986)
Adam G. NUNEZ
v.
WAINOCO OIL & GAS COMPANY, Tidewater Realty, Inc., Tidewater Barges, Inc., Wilshire Oil & Gas Company of Texas, Southern Cross Limited of Colorado, C.D.C. Producing Company, Williams Exploration Company, Southport Exploration, Inc., the John W. Mecom Company, T. Keith Marks, Donald F. Todd, Cynthia Todd Hendon, Ronald E. Martin, Guy V. Land, Remuda Corporation, Lawrence Barker, Jr., H.T. Freeman, Trustee, Joe Ramos, Trustee, William W. Wilson, Trustee, A.K. Mittelstaedt, Trustee, Robert E. Miller, Irving Pollack, John C. Kinard, Dan W. Williams, Andrew R. Fish, Harry Dernick, Dernick Resources, Inc., Marinex Petroleum Company, Roger and Company, Wynn & Associates, Exchange Oil & Gas Corporation, Leon County Development Company, Inc. and Cameron Development Company, Inc.,
No. 85-C-2307.
Supreme Court of Louisiana.
May 20, 1986.
Rehearing Denied June 19, 1986.
Robert T. Jorden, Kerry M. Massari, Lawrence P. Simon, Jr., Martha Q. Thomas, *956 Liskow & Lewis, Lafayette, John M. McCollam, Gordon, Arata, McCollam, Stuart & Duplantes, New Orleans, Edmund McCollam, McMahon & McCollam, Houma, for defendant-applicant.
Adam Nunez, Sulphur, for plaintiff-respondent.
CALOGERO, Justice.
We granted writs to determine whether the intrusion of a well bore (several inches in diameter) into the earth, at a point two miles beneath the surface, constitutes a trespass on the surface owner's property, where that property is included in a drilling unit created by the Commissioner of Conservation. Further, if a protected interest is involved, we are asked to consider whether La.Rev.Stat.Ann. § 30:1 et seq (which established and regulates the Department of Conservation and specifically authorizes the Commissioner to establish drilling units) supercedes the surface owner's right to absolute control of the subsurface as apparently envisioned by La.Civ. Code Ann. art. 490.
FACTS:
On July 8, 1980, R.T. Sutton, the Commissioner of Conservation at that time, signed Order Nos. 1095 and 1016-B-2 to establish rules and regulations in the creation of three drilling and production units for the Lower Abbeville A Sand, Reservoir A, in the West Cameron Block 10 Field and Ocean View Beach Field, Cameron, Louisiana.[1] These orders followed a public hearing during which the geology of the area was discussed with regard to varying proposals for the creation of units as well as the optimum location for drilling wells within the units.[2] At the hearing, it was established that the highest structural position within Sand Unit F, and therefore the optimum position for location of the well which would be drilled within Sand Unit F, was in the western portion of the 350 acre unit and included the area of a small unleased tract owned by plaintiff, Adam Nunez. Although Wainoco Oil Company, which had begun exploring the Lower Abbeville A sand in 1977, had leased several tracts within Sand Unit F, the company had not acquired a lease on the Nunez tract. In declining to lease his land, Adam Nunez had opted to bear personally the financial risk of paying his share of drilling in return for the right to recover 100% of the production attributable to his tract's participation in the unit, rather than just a fractional royalty interest.
On August 25, 1980, Wainoco filed an application with the Office of Conservation to drill the R.R. Stone No. 1 well within the surface boundaries of the recently created unit. The permit was granted on September 23, 1980. Although Wainoco proposed to drill on the Stone tract on which they possessed a lease, the company contacted all owners in Sand Unit F prior to commencing operations to offer insurance coverage for the drilling and to submit an authority for expenditure setting forth the anticipated cost of drilling. All owners, including plaintiff Adam Nunez, agreed to advance proportionate shares of the costs for the Stone well.
Neither the application nor the permit, however, specified that drilling was limited to the unitized sands. In fact, both stated that any zone or reservoir to a depth of 14,000 feet was a possible target. And the greatest depth at which Lower Abbeville A Sand, Reservoir A had been defined by the Department of Conservation was at 12,130 *957 feet.[3] The well permitted on September 23 then was one that could be drilled deeper than the Lower Abbeville A Sand had been defined thus far. The permit did specify, however, that the well was subject to Department of Conservation Order Nos. 29-B, 29-E, and 1016-B-2. Order Nos. 29-B and E are statewide rather than unit orders, which outline pertinent drilling regulations and specific well spacing.[4] Order No. 1016-B-2, mentioned at the outset of the opinion, created Sand Unit F in the Lower Abbeville A sand, and its rules and regulations would be applicable to the well drilled by Wainoco if it produced from the Lower Abbeville A Sand. Generally, a state-wide order is directed toward the prevention of physical waste through the conduct of proper drilling practices, while the field or unit order is more concerned with the prevention of underground waste and maximum recovery of hydrocarbons. H. Daggett, Mineral Rights in Louisiana 487 (1949).
The location of the Stone well, according to the original permit, was in accordance with the optimum position for the Sand Unit F well as determined by the pre-unitization public hearing.[5] The actual location of the well, also considered an optimum location, was one foot farther north and 22 feet to the west of the permitted site, which placed it approximately 20 feet from a boundary of the Nunez tract. (It should be noted that the proximity of either site to Nunez property would have violated Order No. 29-E and prevented production should a unit not have been created.) Allegedly, the movement of the well was prompted by the proximity of the Boudreaux residence.[6] The drilling permit was not amended, however, until February 11, 1982 to reflect the well's actual location.[7]
Drilling at the altered site had reached 10,000 feet by November 4 or 5, 1980. A directional survey, performed only in response to plaintiff's lawsuit, indicated that the well bore had entered Nunez property at that point and time; that it crossed back into Stone property before re-entering the Nunez tract on November 8 or 9 at 11,000 feet; and that it was ultimately bottomed 4 or 5 feet onto Nunez property although the intrusion may have persisted vertically for almost 750 feet, between depths of 11,000 feet and 11,730 feet. According to the directional survey, then, the deviation from the well's surface location to the bottom hole was significantly less than five degrees. A well bore that has less than a five degree deviation from the vertical is by definition a straight hole under the provisions of Order No. 29-B, a statewide order made specifically applicable to defendant's September 23, 1980 drilling permit.
*958 Before the well could be completed and production begun, it was necessary that it be designated the unit well for Sand Unit F, which as noted earlier had been created on July 8, 1980 by Order Nos. 1095 and 1016-B-2. Consequently, after determining that the well could be produced from the unitized sand, Wainoco applied to the Department of Conservation to amend the well name from R.R. Stone to L ABB A RA SUF, Stone No. 1. An amended permit was issued on December 8, and on December 23, 1980, the well was completed. It thereupon began producing as the unit well for Sand Unit F.[8]
PROCEDURE:
On August 21, 1981, Adam Nunez filed suit in the 38th Judicial District Court, Parish of Cameron against Wainoco Oil Company and other owners within Sand Unit F. He alleged that the Stone No. 1 well was bottomed in his property, and that same constituted a trespass. He sought an injunction ordering Wainoco to remove the well bore. The suit was dismissed on the ground that it was a collateral attack upon an order of the Commissioner of Conservation. The lawsuit was thereupon filed in the 19th Judicial District Court, East Baton Rouge Parish, and the Commissioner of Conservation and other owners of working interests in Sand Unit F were added as defendants.
Plaintiff moved for summary judgment on the issue of his right to an injunction, and the defendants filed a cross-motion for summary judgment asking that plaintiff's suit be dismissed if the court upheld the Commissioner's authority and duty to designate the unit well. The trial judge denied plaintiff's motion; he granted the motion for summary judgment on behalf of the Commissioner of Conservation and dismissed the Commissioner as a defendant; and he granted partial summary judgment in favor of the other defendants, affirming the Commissioner's refusal to order removal of the well and the right of the other defendants to continue to operate the well.
On appeal, the First Circuit affirmed the motion for summary judgment granted in favor of the Commissioner of Conservation, which dismissed him from the suit. The court concluded that "the commissioner was within his authority to issue the unitization order and to designate a unit well thereon." However, with regard to the other defendants, the First Circuit ruled that the Commissioner's order did not and could not authorize drilling on or under unleased property without the consent of the landowner. Thus, the Court of Appeal panel held that "[i]f in drilling this well, the unit operator enters onto or drills under property in or out of the unit without permission from the owner of the land, the operator has committed a trespass." Accordingly, the case was remanded to the trial court for a determination of whether a trespass took place and, if so, whether the trespass was in good or bad faith. Citing case law, the court reasoned that any bad faith trespasser would be compelled to remove the encroachment and to pay damages.
SUBSURFACE TRESPASS
A subsurface trespass is defined as
The bottoming of a well on the land of another without his consent ... [which] results from the drilling of a "slant" or directional well, which may be intentional or inadvertent. Since subsurface trespass is as wrongful as surface trespass, the same liability attaches, viz., the damages in the amount of the value of the oil produced. H. Williams and C. Meyers, Oil and Gas Terms 737 (5th ed. 1981).
That definition is in accord with our decision in Gliptis v. Fifteen Oil Co., 204 La. 896, 16 So.2d 471, 474 (1943), which concluded that the invasion by any person into the subsurface of his neighbor's land and the extraction therefrom of minerals such as oil and gas would be a trespass. Although *959 the Gliptis court did not consider damages, since the primary issue there concerned whether to permit appointment of an expert to make a directional survey of the defendant's well, the California cases relied on recognized that "damages are measured by the amount of oil and gas taken from the well." Id. at 480 (quoting Summers, Oil & Gas Vol. I, § 26 (Perm.Ed. 1938)).
Thus, subsurface trespass, which by definition involves bottoming of a well on the land of another without his consent, and/or invading or intruding upon the subsurface of another's land, has in the jurisprudence generally been accompanied by removal of minerals, with the attendant damages consisting of the value of the extracted minerals. In the criminal law context, this removal element would seem to add the crime of theft (La.Rev.Stat.Ann. § 14:67) to criminal trespass (La.Rev.Stat.Ann. § 14:63). The latter statute requires only entering the property of another without authorization. In this case at any rate, both an alleged, unauthorized physical intrusion[9] and the removal of minerals occurred. However, as a participant in a unit created by the Commissioner of Conservation, the property owner claiming trespass was entitled to and did receive a proportionate share of the value of the hydrocarbons produced from the reservoir underlying his land and that of his neighbors.[10]
We find it significant that the situation in Gliptis, from which our definition of subsurface trespass emanates, did not involve a Commissioner's drilling unit. In that case, plaintiff owned a producing oil well, which he alleged was destroyed when the defendant drilled his own well only 33 feet from the property line and bottomed it beneath plaintiff's property, adjacent to his well. The court relied on the established rule that the owner of land has the exclusive right to explore his land for the production of minerals, which necessarily foreclosed the right of a neighbor to invade his subsurface and to extract the fugacious minerals. As will be developed later in this opinion, it was in response to such a situation that the Commissioner of Conservation was empowered by La.Rev.Stat.Ann. § 30:9 B to establish drilling units, defined as "the maximum area which may be efficiently and economically drained by one well," in order to prevent waste, to avoid the drilling of unnecessary wells, and, coincidentally, to regulate conduct of neighboring owners.
Therefore, we must consider whether the formation of a compulsory unit, as permitted in La.Rev.Stat.Ann. § 30:10, affects the generally applicable principles concerning ownership of property and/or alters the concept of trespass beneath the surface owner's tract. In that regard, we review Title 30, Minerals, Oil, and Gas, its history and its application.
LA.REV.STAT.ANN. § 30:1 et seq:
LOUISIANA'S OIL AND GAS CONSERVATION LAW
Oil is found in reservoirs which generally are bodies of porous and permeable rock in *960 which oil has accumulated in sufficient quantity to permit its commercial recovery. In order for this underground accumulation to permit profitable production, there must be a high enough concentration of oil to permit movement and there must be a source of energy available to move the oil from the reservoir into the well. Although this reservoir energy may be of several types, the chief expulsive force is gas. Production occurs once the reservoir is punctured by drilling operations and the pressure gradients combine to move the oil toward the point of lower pressure and to lift it through the opening to the surface. Since gas and water tend to move toward the area of reduced pressure more rapidly than does oil, these sources of reservoir energy may by-pass the oil, making their way to the well alone and leaving behind a part of the oil, if production is not controlled. It is necessary to employ a reasoned and proportionate use of the reservoir energy if production is to bring to the surface the greatest percentage of recoverable oil. H. Daggett, supra at 414-17.
In the early days of the oil industry, these physical factors were poorly understood. It was thought that oil flowed in underground rivers and an analogy was seen between the ownership of oil and the ownership of water and animals which traverse one's property. Thus the "rule of capture" was adopted (and has been sustained within certain limitations even after the nature of reservoirs was better understood.) It has been defined as
a rule of law (sometimes called rule of convenience) arising from ownership of property, or the right to produce oil and gas, by virtue of which an operator who drills on his own land, or land held under an oil and gas lease or other instrument, acquires title to the oil which he legally produces from the well, whether or not drainage takes place from surrounding properties. H. Daggett, supra at 419-21.
Needless to say, the period of oil and gas development that followed the adoption of such a rule was characterized by haste, inefficient operations, and immeasurable waste within the ground and above. In Lilly v. Conservation Commissioner of Louisiana, 29 F.Supp. 892, 897 (E.D.La. 1939), it was suggested that
without the power to regulate or control conditions in an oil field, the temptation to acquire quick riches might easily produce an intolerable situation in drilling indiscriminately upon any size or shape of tract, sufficient to permit derrick operations, resulting in waste and exhaustion of underground energy consisting of natural gas, etc. and ultimately restricting recovery, involving useless expenditures by operators and preventing some, if not all, from recovering their investments.
Thus, this federal district court judge reasoned that
[s]uch a condition, it would seem, should be subject to the police power of the State, not only to prevent waste, but to insure a fair and reasonable participation, by the surface owners in the common pool within the producing area.
In fact, Louisiana early recognized the need for legislative control of the industry and displayed a concern that an irreplaceable natural resource should not be subjected to avoidable waste. Thus, in 1905, gas was discovered in the Caddo Field in North Louisiana, and, in 1906, the Legislature responded to a disastrous blowout by making it a criminal offense to negligently permit a gas well to burn wastefully.[11] Then, in 1924, the first all-inclusive statutes, one for gas and one for oil, were enacted, and the principle of ownership in a common source of supply co-extensive with the individual ownership in the land was recognized.[12] A comprehensive statute modeled after New Mexico's law, regulated the spacing of wells and authorized compulsory pooling, in 1936.[13] It failed, however, to adequately define "waste," and its general *961 procedural articles were inadequate. Rather than amend the conservation measures piecemeal, the Legislature determined that a complete revision of existing legislation was needed. The result was 1940 La.Acts No. 157, which embodied the best features of the New Mexico law as well as the then recently enacted Arkansas law. Based on almost 50 years of legislative experience and judicial interpretations, this conservation statute was considered one of the best in the country. L. Moses, Louisiana's Oil and Gas Conservation Law, 24 Tul.L.Rev. 311 (1950). This act, as amended, constitutes Louisiana's basic conservation law with respect to the oil and gas industry.
At the time of the act, the Department of Conservation, directed and controlled by the Commissioner of Conservation, had already been established by La. Const. of 1921, art. VI, § 1(C).[14] When the 1974 Constitution deleted Article VI, § 1(C) of the 1921 Constitution,[15] La.Rev.Stat.Ann. § 30:1 A was amended to establish the Department under the direction of a Commissioner who was to be appointed by the governor for a four year term, with the consent of the Senate.
The Commissioner has the general power and "authority over all persons and property necessary to enforce effectively the provisions of this Chapter and all other laws relating to the conservation of oil and gas."[16] He has specific investigative powers to determine whether or not "waste"[17] exists or is imminent[18] and the general authority to establish whatever rules, regulations, and orders are necessary to prevent it and to enforce the conservation laws.[19] In recognition of the physical factors involved in the production of hydrocarbons, the Commissioner is also given the specific power to establish a drilling unit or units for each pool.[20] Although the owners of separate tracts may "agree to pool their interest and to develop their lands as a drilling unit,"[21] the Commissioner is authorized to "require" unwilling owners to pool their interests if he finds it necessary to prevent waste or to avoid drilling unnecessary wells.[22] This power of forced integration has been described as "[a] necessary weapon in the enforcement of drilling patterns."[23]
The effects of forced pooling have been described in Mire v. Hawkins, 249 La. 278, 186 So.2d 591, 596 (1966). Forced pooling *962 or compulsory unitization was found to convert separate interests within the drilling unit into a common interest with regard to the development of the unit and the drilling of the well. The Mire court, asked to consider whether the designation of nondrilling areas within drilling units created by the Department constituted an obstacle to the use of a mineral servitude on lands within the nondrilling areas, recognized that the effects of unit operations were "a departure from the traditional notions of servitude contemplated by the Civil Code" although they were validly imposed by law for a public purpose.
In fact, the concept of unitization, embodying the principle of ownership in minerals produced from a common source of supply, co-extensive with the individual ownership of the overlying land, is a departure from the traditional notions of private property. Ownership, defined in La.Civ. Code Ann. art. 477 as "the right that confers on a person direct, immediate, and exclusive authority over a thing," suggests dominion and does not contemplate that others have rights to the object of ownership. According to La.Civ.Code Ann. art. 490, such exclusive authority, applies to the subsurface directly beneath a property owner's tract.
We note, however, that each of these provisions has been modified in recent years to reflect a qualification of sorts in one's rights in private property. Whereas the predecessor to La.Civ.Code Ann. art. 477[24] granted to the owner use of property "in the most unlimited manner, provided it is not used in any way prohibited by law or ordinances," currently an owner may use, enjoy, and dispose of a thing only "within the limits and under the conditions established by law," which contemplates a broader range of exceptions to an owner's exclusive authority. And, La.Civ.Code Ann. art. 490's assertion that "the ownership of a tract of land carries with it the ownership of everything that is directly above or under it" was modified in 1979 to add the phrase "[u]nless otherwise provided by law." Such a change no doubt did occur, at least in part, in recognition of the traits of subsurface minerals in liquid and gaseous form.
Those traits prompted inclusion in the Mineral Code (Title 31) of § 6 which provides:
Ownership of land does not include ownership of oil, gas, and other minerals occurring naturally in liquid or gaseous form, or of any elements or compounds in solution, emulsion, or association with such minerals. The landowner has the exclusive right to explore and develop his property for the production of such minerals and to reduce them to possession and ownership. (emphasis added) 1974 La.Acts No. 50, § 6.[25]
Thus, it is clear that whatever the plaintiff may own under his tract, it does not include the liquid or gaseous minerals themselves. And, even the "exclusive right to explore" is qualified by the imposition of duties with regard to others who have rights in the common reservoir. La.Rev. Stat.Ann. § 31:9 and 10. As noted by a scholar on the subject, "[t]he principles of private ownership which involve dominion on the part of the landowner over all substances from the center of the earth to the heavens were inadequate to solve the problems of a substance under the earth, which would migrate to points of lower pressure caused by punctures of the reservoir by drilling." H. Daggett, supra at 415.
And what this plaintiff does own under his tract is "subject to reasonable statutory restrictions and the reasonable exercise of the police power." According to La. Const. art. I § 4:

*963 Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Furthermore, this Court has already ruled that the Commissioner of Conservation's power to establish drilling units is a constitutional exercise of the State's police powers. Hunter Co., Inc. v. McHugh, 202 La. 97, 11 So.2d 495, 502-03 (1942) (quoting Ohio Oil Co. v. Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729 (1900)). In Ohio Oil Co. v. Indiana, the United States Supreme Court viewed a similar statute as one actually "protecting private property and preventing it from being taken by one of the common owners without regard to the enjoyment of the others."
Unitization is the device which the Louisiana Department of Conservation employs to protect the correlative rights of surface owners in a common reservoir, and, as discussed earlier, the device is clearly available without the consent of a particular landowner. La.Rev.Stat.Ann. § 30:10 A(1). In addition to the ability to establish drilling units for each pool, the Commissioner is authorized to designate a drilling site "at the optimum position in the drilling unit for the most efficient and economic drainage of such unit." La.Rev.Stat.Ann. § 30:9 C. The Commissioner must also issue a permit before the well can be drilled, and "the issuance of the permit ... is sufficient authorization to the holder of the permit to enter upon the property covered by the permit and to drill in search of minerals thereon." § 30:204 A and F. Although § 30:217 specifically requires the consent of the owner before any person conducts geological surveys for oil, gas, or other minerals, § 30:204 F, authorizing the permit holder to enter the property for drilling purposes, has no such requirement for consent.
In fact, the high court of another oil producing jurisdiction has held that the operator of a pooled unit has a right to drill on a tract without the consent of the owner of the land on which the well was to be located.[26]Texas Oil and Gas Corp. v. Rein, 534 P.2d 1277, 12798 (Okla.1975). The Oklahoma Supreme Court noted that
To hold otherwise would frustrate the intent of the Act because the owner desiring to drill would not be entitled to do so unless he held a lease covering the well location designated by the Commission.
Like the Oklahoma Supreme Court, we conclude that the established principles of private ownership, already found inadequate in Louisiana to deal with the problems of subsurface fugacious minerals (see Daggett, supra at 415), need not necessarily be applied to other property concepts, like trespass, within a unit created by the Department of Conservation. Unitization, which creates rights and interests in a pool of hydrocarbons beyond the traditional property lines, effectively amends La.Civ. Code art. 490 and other private property laws in the interest of conserving the natural resources of the state and, in effect, of protecting private property interests, or "correlative rights," of nondrilling landowners. By prohibiting an individual landowner in the unit from drilling wells on their own tracts, by forcing them to share production, and by limiting the amount of hydrocarbons that can be produced, the exercise of the Commissioner's power to unitize necessarily results in infringement on the usual rights of ownership. Unitization has also resulted in changes in the legal relationships between landowners and lessees within the unit. For instance, the *964 inclusion of a leased tract within a unit relieved the lessee of the tract of his obligation to drill a well on the leased premises. The Court in Delatte v. Woods, 232 La. 341, 94 So.2d 281, 287 (1957), relied on the established rule that "the drilling and production of oil from a unitized area constitutes an exercise and use of the mineral rights throughout the entire unit and operates as a substitute for performance of drilling obligations contained in a mineral lease covering any property or tract located within the unit."
Therefore, we hold that the more recent legislative enactments of Title 30 and Title 31 supercede in part La.Civ.Code Ann. art. 490's general concept of ownership of the subsurface by the surface owner of land. Thus, when the Commissioner of Conservation has declared that landowners share a common interest in a reservoir of natural resources beneath their adjacent tracts, such common interest does not permit one participant to rely on a concept of individual ownership to thwart the common right to the resource as well as the important state interest in developing its resources fully and efficiently.
In this case, we do not have a well located on the surface of a tract without the owner's consent. Instead, we have the intrusion of a well bore two miles beneath the surface of plaintiff's land, land which had already been included in a drilling unit. The well itself was drilled on a leased tract, in part at the urging of the plaintiff[27] and with his financial participation. It was a well permitted and subject to Statewide Order No. 29-B, which allows a drilling deviation from the vertical of up to five degrees. Although the well was not formally designated as the unit well until 33 days after the well bore likely traversed the invisible boundary into plaintiff's property, the well was clearly intended to be the unit well[28] and could not be produced until it was declared the well for Sand Unit F, or, if the well bottomed in other than Reservoir A, until another unit was created. Therefore, we conclude that the intrusion into the subsurface two miles beneath the tract owned by Adam Nunez was an authorized unit operation. Since established private property law concepts, such as trespass, have been superceded in part by Louisiana's Conservation Law when a unit has been created by order of the Commissioner, we do not find that a legally actionable trespass has occurred in this instance.[29]

*965 Decree

For the foregoing reasons the judgments of the district court and Court of Appeal, 477 So.2d 1149, relative to defendant/relators' motion for summary judgment, are set aside; summary judgment is herewith rendered in favor of defendant/relators and against plaintiff, dismissing plaintiff's suit with prejudice and at his costs.
JUDGMENTS SET ASIDE; SUMMARY JUDGMENT IN FAVOR OF DEFENDANT/RELATORS GRANTED.
WATSON, J., dissents believing there was an actionable trespass.
NOTES
[1] The three units were:

a) Lower Abbeville A RA SUG with designated unit well, 6930 No. 4
b) Lower Abbeville A RA SUH with designated unit well, 6930 No. 1
c) Lower Abbeville A RA SUF which had no designated unit well.
Sand Units G and H were offshore units, and Sand Unit F was composed of adjoining onshore acreage.
[2] The Commissioner's authority to hold hearings is based on La.Rev.Stat.Ann. § 30:4 B. The hearings are informal, and the Commissioner usually admits all evidence which appears to be relevant without regard to rules of evidence. L. Moses, Louisiana's Oil and Gas Conservation Law, 24 Tul.L.Rev. 311, 315 (1950).
[3] Lower Abbeville A Reservoir A had been originally defined in 1977 Order No. 1016 as the "gas and condensate bearing sand encountered between the depths of 10,970 and 11,022 electrical log measurements" and later, in Order No. 1016-B-1, as "that gas and condensate bearing sand encountered between the depths of 12,030 feet and 12,130 feet electrical log measurements." The difference apparently reflects that a given sand is encountered at different stratographic depths depending on the location within the field.
[4] Order No. 29-E requires that wells be spaced 330 feet from a property or unit boundary line and that there must be 900 feet between oil wells and 2,000 feet between gas wells.
[5] The placement of the well could have been located some distance from the existing placement and remained in an optimum location for Sand Unit F. In fact, under the established interpretation of § 30:9 C by the Commissioner, adherence to Order No. 29-E with its well spacing requirement results in well placement at the optimum allowable geological location.
[6] Apparently the original well site was too close to the Boudreaux residence. While no regulation required the change, it was likely done to accomodate the Boudreauxs. As an aside, for a well drilled below 15,000 feet (not applicable here) legislation dictates that it cannot be located closer than 500 feet to any dwelling.
[7] Joseph W. Hecker, Chief Engineer of the Louisiana Commission of Conservation, stated in deposition that it was not uncommon to amend the location for any number of reasons. He mentioned that property might be missurveyed, or that survey markers could be removed, or that the plat location could simply make it difficult to erect a derrickall of which could result in locating a well other than at the precise permitted site.
[8] It is also worthy of note that the unit boundaries and the unit well, at its amended location, were confirmed by the Commissioner of Conservation after a public hearing on June 8, 1982 by Order Nos. 1095-B and 1016-B-3, despite the protest of the plaintiff who presented allegations regarding the intrusion of the well bore into the subsurface beneath his tract.
[9] Plaintiff's claim is founded on his ownership of that part of the earth which is two miles beneath the surface of the tract of land to which he holds title. Indeed, La.Civ.Code Ann. art. 490 provides in pertinent part:

Unless otherwise provided by law, the ownership of a tract of land carries with it the ownership of everything that is directly above or under it.
Noting that the earth is round, we point out that a surface tract's subsurface measurement must necessarily narrow as it approaches the center point of the earth. Ownership of subsurface tracts equal in size to surface tracts would result in overlapping boundaries as the available area diminishes. Just how much or how little plaintiff's subsurface ownership has narrowed at a depth of two miles is a peripheral question which, needless to say, will not be addressed in this opinion.
[10] Assuming a trespass, plaintiff is unable to claim the traditional "damages," his value of the hydrocarbons produced, for he has already received his proportionate share of production from the unit. He does, however, seek further relief in his claim for an injunction, ordering the offending operator to remove the well bore. Defendants suggest that the removal of the well would result in significant waste in that a producing well would be destroyed and the ultimate recovery of reserves underlying the unit would be decreased. They note that due to the stage of reservoir depletion, a substitute well probably would not be economically feasible, which would further prejudice the correlative rights of all parties in the unit.
[11] 1906 La.Acts No. 71.
[12] 1924 La.Acts Nos. 252 and 253.
[13] 1936 La.Acts No. 225.
[14] This article created a Department of Conservation to regulate the state's natural resources other than animals, game, and aquatic life. However, legislation regarding the administration of conservation matters began as early as 1908 when a Board of Commissioners, authorized to investigate and report on the condition of the natural resources of the state, was created by 1908 La.Acts No. 144. H. Daggett, supra at 478.
[15] Article IX of the 1974 Constitution now deals generally with natural resources. Section 1 of Article IX contains the basic assertion of the public policy of protecting and conserving the natural resources of the state and grants authority to the Legislature to enact laws to implement this policy.
[16] La.Rev.Stat.Ann. § 30:4 A.
[17] "Waste" and its prevention, which is at the foundation of the state's conservation policy, is appropriately the first definition in § 30:3. Waste includes

(a) the inefficient, excessive, or improper use or dissipation of reservoir energy; and the location, spacing, drilling, equiping, operating, or producing of an oil or gas well in a manner which results, or tends to result, in reducing the quantity of oil and gas ultimately recoverable from a pool....
[18] § 30:4 B.
[19] § 30:4 C.
[20] § 30:9 B.
[21] § 30:10 A.
[22] La.Rev.Stat.Ann. § 30:10 A(1) provides:

(1) Where the owners have not agreed to pool their interests, the commissioner shall require them to do so and to develop their lands as a drilling unit, if he finds it to be necessary to prevent waste or to avoid drilling unnecessary wells.
The various unitization statutes uniformly permit interested parties to institute unitization proceedings, and several statutes allow the regulatory commission to act upon its own motion as well. H. Williams and C. Meyers, Oil and Gas Law Vol. 6 § 913.3 (1985).
[23] L. Moses, supra at 316.
[24] La.Civ.Code Ann. art. 491, amended 1979 La. Acts No. 180.
[25] Although the 1974 Mineral Code apparently first provided statutory authority for the proposition that oil and gas under the ground is not susceptible to ownership, early jurisprudence recognized this very concept. See Frost-Johnson Lumber Co. v. Sallings Heirs, 150 La. 756, 91 So. 207 (1922).
[26] The Oklahoma statute, like its Louisiana counterpart, requires a hearing prior to the declaration of a unit. Should it be shown that the drilling of the well at the prescribed location would be inequitable or unreasonable, the well need not be drilled at the designated site. Further, any order is made with "just and reasonable" conditions designed to afford the owner of the tract designated as the optimum location with the opportunity to recover his fair share of production without unnecessary expense. Similarly, the Louisiana jurisprudence has held that an order by our Commissioner of Conservation must be "reasonable" and can be overruled by a contrary showing. Alston v. Southern Production Co., 207 La. 370, 21 So.2d 383 (1945).
[27] At public hearings prior to the issuance of Order Nos. 1095 and 1016-B-2, plaintiff and his geologist, James Namias, expressed concern that his property was being drained by producing wells in the field, and applied for inclusion of this property in producing units. Apparently in response to exhibits and testimony presented on behalf of plaintiff in 1979, the Commissioner decided in 1980 to create an additional unit, Sand Unit F, which would include all of the plaintiff's unleased acreage not already included in a producing unit.
[28] The jurisprudence indicates that it is the intent of the operator and the operations conducted which determine whether drilling operations constitute unit operations or merely lease operations. In Bass Enterprises Production Co. v. Kiene, 437 So.2d 940 (La.App.2d Cir. 1983), the well was permitted for non-unitized sand but was drilled within the boundaries of a unitized sand. When the permitted sand was found not to be commercially productive of hydrocarbons, the well was plugged back and tested at other intervals, including the unitized sand. Although production was not obtained from the unitized sand and thus the well was never permitted as the unit well, these operations were sufficient to interrupt prescription on a servitude tract within the unit. Similarly, in Gorenflo v. Texaco, Inc., 566 F.Supp. 722 (M.D.La.1983), operations for the drilling of a well, conducted before the well was permitted as the unit well, were found sufficient unit operations to maintain the lease. The court noted that there was no indication that "drilling under a permit which gives the well a name which does not show its status [as a unit well] is illegal." Id. at 729. Indeed, the amended permit, which designated the Stone Well No. 1 as the unit well for Sand Unit F, indicated that the amendment action was a change in the well "name" from lease to unit. Such a procedure does not seem to be of sufficiently significant stature to affect the relationships between the parties.
[29] However, we acknowledge that should a unit operation create for one landowner within the unit a particular expense, as a result of damage to his premises, or measurable inconvenience, that landowner may be entitled to recover compensation in addition to a proportionate share of production, a matter which we need not resolve in this case. See Cormack v. Wil-MC Corp., 661 P.2d 525 (Okla.1983). In Cormack, the Oklahoma Supreme Court concluded that although an owner of an unleased mineral interest in a tract incorporated by a forced pooling order may be required by the state to accept an intrusion on his land for the drilling of a well and to accept the accompanying damages to his property, he is entitled to a cause of action for compensation for those damages. (The damages in Cormack, however, were surface damages.)