**Lubin P. RAYMOND, Sr., et al.**

v.

**UNION TEXAS PETROLEUM CORPORATION, et al.**

Civ. A. No. 87–517.

United States District Court,
E.D. Louisiana.

Sept. 30, 1988.

George J. Higgins, Jr., Horne, Higgins & Higgins, New Orleans, La., for plaintiffs.

John M. Wilson, Stevia M. Walther, Liskow & Lewis, New Orleans, La., for defendants.

## MEMORANDUM OPINION

MENTZ, District Judge.

Lubin Raymond, Sr. and other owners of land in Lafourche Parish, Louisiana filed this diversity suit against defendants, Union Texas Petroleum Corporation (UTP) and Enstar Corporation (Enstar) claiming

that defendants are using the plaintiffs' land for salt water disposal without compensating plaintiffs for that right. Plaintiffs' complaint alleges that defendants injected salt water into a disposal well on neighboring property which migrated and unlawfully invaded the subsurface of plaintiffs' property. Plaintiffs claim lost revenues and permanent damage to their property as a result of the salt water disposal. Upon agreement of the parties, the case was submitted upon the briefs, documents, and deposition testimony without a trial.

Plaintiffs own three tracts of land in an area known as Cut Off Field. A large portion of these three tracts was included in the UL-2 Reservoir B Sand Unit A (UL-2 RB SUA) established by the Louisiana Commissioner of Conservation in Order No. 600-L dated July 12, 1979, and effective June 26, 1979.[1] Order No. 600-L force pooled the separately owned properties within the unit for production from the sand encountered between the depths of 13,828 feet and 13,898 feet in the McAlester Fuel Company Braud No. 1 S/T Well. Other portions of plaintiffs' property were similarly included in the Tex W-7 RA SUA,

Tex W-8 RA SUA, and Tex W-7 RB SUA, also established by the Commissioner of Conservation.

Belton Badeaux, a non-party, owns a tract of land adjoining the northern boundary of one of the three tracts owned by plaintiffs.[2] The remaining tracts held by plaintiffs are separated from Badeaux's property by another tract approximately fifty feet wide. Badeaux's property is unitized with plaintiffs' property in the UL-2 RB SUA.

Defendants' predecessor in interest executed standard oil, gas, and mineral leases with plaintiffs on each of their three tracts[3] and with Belton Badeaux.[4] The oil, gas, and mineral leases are identical in all material respects.[5] In 1979, defendants drilled and completed the Minola P. Badeaux Well No. 1 on the tract owned by Belton Badeaux and utilized with plaintiffs' land. The well was drilled to a depth of approximately 14,000 feet and then plugged when it did not produce oil or gas.

In 1981, defendants applied for and received a permit from the Commissioner of

---

1. Plaintiffs' three tracts are identified on the Cut-Off Field land plat, Exhibit A as follows: 1) Tract A comprising 12.74 pooled acres; 2) Tract C comprising 6.46 pooled acres; and 3) Tract D comprising 12.98 pooled acres.

2. Belton Badeaux's tract is identified on the Cut Off Field land plat, Exhibit A,* as Tract B, comprising 4.76 acres.

   *Exhibit A was not suitable for publication. It was important to this decision only insofar as it showed the location of the plaintiffs' tracts in relation to the various units in the Cut-Off Field.

3. A. Oil, Gas and Mineral Lease dated November 2, 1976, between Lubin Raymond, Estelle R. Williams, Therese R. Duet, Vivian R. Schouest, Alice R. Ledet and Florine R. Cheramie, lessors, and Dave J. Robichaux, lessee.

   B. Oil, Gas and Mineral Lease dated November 2, 1976, between Lubin Raymond, lessor, and Dave J. Robichaux, lessee.

   C. Oil, Gas and Mineral Lease dated October 2, 1979, between Aura P. Raymond, Estelle Raymond Williams, Vivian Raymond Schouest, Lubin Raymond, Florine Raymond Cheramie, Theresa Raymond Duet, and Alice Raymond Ledet, lessors, and Dave J. Robichaux, lessee.

4. Oil, Gas and Mineral Lease dated April 24, 1979, between Belton Badeaux, lessor, and Dave J. Robichaux, lessee.

5. The leases provided in pertinent part as follows:

   Lessor, in consideration of the sum of

   hereby leases and lets unto Lessee, the exclusive right to enter upon and use the land hereinafter described for the exploration for, and production of oil, gas, sulphur and all other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession, storage and transportation of said minerals (either from said land or acreage pooled therewith), and the right to dispose of salt water, with the right of ingress and egress to and from said lands at all times for such purposes, including the right to construct, maintain and use roads, pipelines and/or canals thereon for operations hereunder or in connection with similar operations on adjoining land, and including the right to remove from the land any property placed by Lessee thereon and to draw and remove casing from wells drilled by Lessee on said land; the land to which this lease applies and which is affected hereby being situated in Lafourche Parish, Louisiana, and described as follows, to wit: ...

Conservation to recomplete the Badeaux well as a salt water disposal well for salt water produced in the Cut Off Field. In order to make the conversion to a salt water disposal well, perforations were made in the well casing at a depth of approximately 2650 feet. This is not the stratum unitized as the UL–2 RB SUA, which is located at 13,828 to 13,898 feet beneath the surface. Salt water is transported to the well by truck and pipeline and then injected at pressures averaging 450 psi to 600 psi into the well to a subsurface stratum found between 2628 feet and 2651 feet beneath the surface. The formation into which the salt water is injected contained salt water in its natural state before the injection began. The nature of the formation confines the salt water to that stratum.

The Badeaux well has been used for salt water disposal since 1981. In April 1984, Belton Badeaux granted defendants a salt water disposal lease.[6] The annual disposal rates have exceeded the 10–12 barrels of salt water per day anticipated by defendants in their permit application:

| 1982: | 56,925 barrels |
|---|---|
| 1983: | 131,632 barrels |
| 1984: | 63,063 barrels |
| 1985: | 66,601 barrels |

However, the permit does not limit the amount of salt water that may be injected in the well. The salt water disposal reports indicate that all of the salt water injected into the Badeaux well is produced from the Cut Off Field. Sixty percent of that salt water is produced from units other than UL–2 RB SUA, namely: Tex W–8 RA SUA; UL–2 RA SUA; 10900 RK SUA; and Tex W–7 RA SUA.

Plaintiffs contend that the oil, gas and mineral leases give defendants the right to use their property for discovery, production, salt water disposal, and other purposes when such results from production on their land or land pooled therewith, but not when it results from production on land not pooled with plaintiffs'.[7] Thus, plain-

---

6. The Salt Water Disposal Lease grants defendants the following:

(a) The right to dispose of salt water from any source, whether or not produced from the Property or property unitized therewith, and in any quantity, on the Property by subsurface injection through the Well;

(b) The right to maintain the Well and any pipelines, appurtenances thereto, equipment, roads, or facilities reasonably necessary to the convenient conduct of salt water disposal on the Property by subsurface injection through the Well;

(c) The right of access, ingress, and egress to and on the Property reasonably necessary to the convenient maintenance of the Well and/or reasonably necessary to the convenient conduct of salt water disposal on the Property by subsurface injection through the Well, including, but not limited to, the passage of tank trucks;

(d) The right to take such other actions on, or with regard to, the Property as are reasonably necessary to maintain the Well and/or such as are reasonably necessary to the convenient conduct of salt water disposal on the Property by subsurface injection through the Well.

7. The court's opinion should not be construed as finding that the oil, gas and mineral leases permit subsurface migration of injected salt water insofar as it is produced from units encompassing plaintiffs' land. Considering the expert testimony in this case regarding the uncertainty of determining if, when, and where injected salt water might migrate, it is unlikely that an operator would undertake to execute leases with all landowners under whose property injected salt water might migrate. Furthermore, it is now a well-accepted method of handling produced salt water to inject it back into the ground in a formation already containing nothing but salt water. Thus, it may be argued that the lease provision granting the "right to dispose of salt water" contemplates salt water injection from the surface of the lessor's property and all associated surface use such as location of the disposal well, pipelines, roads and other facilities, as well as any inconvenience caused thereby.

Of course, salt water disposal is a necessary part of production operations where salt water comes to the surface along with the oil and gas. Any such production from a unit including part or all of plaintiffs' leased land will benefit the plaintiffs and serve to keep those leases alive. La.R.S. 30:9 and 10; *Acree v. Shell Oil Company,* 548 F.Supp. 1150, 1154 (M.D.La.1982), aff'd, 721 F.2d 524 (5th Cir.1983); *Delatte v. Woods,* 232 La. 341, 94 So.2d 281, 187 (La.1957). The subsequent injection and subsurface migration of the separated salt water to plaintiffs' land is consistent with the lessee's right to use the subsurface of the plaintiffs' land as is reasonably necessary to comply with the terms of the lease and fully enjoy the leasehold interest. The leases contain no restrictions on subsurface use. Arguably, the migration of the salt water to plaintiffs' land is "impliedly granted because such use causes

tiffs contend that defendants are unlawfully using plaintiffs' subsurface property for disposal of salt water to the extent that the salt water was produced from lands neither owned by plaintiffs nor pooled therewith. In support of their argument, plaintiffs point to the separate salt water disposal lease defendants executed with Belton Badeaux granting the "right to dispose of salt water from any source, whether or not produced from the Property or property unitized therewith ..." as evidence that defendants themselves consider their right to salt water disposal under the oil, gas, and mineral leases as limited to plaintiffs' land or acreage pooled therewith.

Plaintiffs are not attacking the Commissioner of Conservation's order permitting the Badeaux well as a salt water disposal well for the Cut Off Field; nor are they seeking to enjoin the defendants' activities. The crux of plaintiffs' suit is that they want to be paid rentals for the disposal of salt water under their lands, just as their neighbor, Belton Badeaux, has been paid.

■ Plaintiffs' complaint asserts a trespass. Trespass is defined as the unlawful physical invasion of the property or possession of another. *Bell v. Sediment Removers, Inc.*, 479 So.2d 1078, 1081 (La.App. 3d Cir.1985), *writ denied*, 481 So.2d 1350 (La.1986). After carefully reviewing this case and the applicable law, the Court finds that there is no legally actionable trespass.

■ Without drilling a well, no one can determine absolutely that salt water is invading plaintiffs' property. Plaintiffs' expert petroleum geologist testified that it is "most likely" that the injected fluid is invading plaintiffs' property. This testimony was uncontradicted. Therefore, the Court finds that plaintiffs were able to establish by a preponderance of the evidence that salt water injected in the Badeaux well migrated to their subsurface property. However, plaintiffs have failed to show, and the court can perceive of no situation

in which they would be able to show, that the salt water produced from lands not pooled with plaintiffs', as opposed to the salt water from lands pooled with plaintiffs', invaded their subsurface property. Once the salt water is comingled, there is no way to prove whether any "unauthorized" salt water invaded plaintiffs' property, because it can no longer be identified by its place of origin. To state that the salt water produced from land not pooled with plaintiffs' land either did or did not invade their subsurface property would be pure speculation, particularly where the salt water was completely fungible even prior to comingling. *See Collins v. Safeway Stores, Inc.*, 187 Cal.App.3d 62, 231 Cal. Rptr. 638 (Cal.Ct.App.1986), where the court stated that it was a practical impossibility to determine whether the plaintiffs purchased contaminated eggs, due to the fact that they had been comingled with good eggs and each carton may have contained one or more contaminated eggs, or none at all.

However, even assuming that salt water produced from land not pooled with plaintiffs' land invaded their subsurface property and that the oil, gas and mineral leases do not authorize such an invasion, plaintiffs' suit must fail for the reasons set forth by the Louisiana Supreme Court in *Nunez v. Wainoco Oil & Gas Company*, 488 So.2d 955 (La.1986), *cert. denied*, 479 U.S. 925, 107 S.Ct. 391, 93 L.Ed.2d 345. In *Nunez*, the defendant Wainco, drilled a well on the surface of leased property adjacent to Nunez's property, which had been included in a drilling unit established by the Commissioner of Conservation. The well bore bottomed four to five feet into Nunez's property at a depth of two miles. Nunez brought suit alleging a subsurface trespass and seeking removal of the well bore. The Supreme Court discussed general principles of private ownership, including the provision in La.C.C. Art. 490 for an owner's exclusive authority over the sub-

---

no damage to the surface or subsurface and is reasonably, if not absolutely, necessary for the accomplishment of the overall purposes for which the lease was granted, i.e., production of oil from the leased property [or land pooled

therewith]." *Leger v. Petroleum Engineers, Inc.*, 499 So.2d 953, 956 (La.App.3d Cir.1986); *TDC Engineering, Inc. v. Dunlap*, 686 S.W.2d 346 (Tex.Ct.App.1985) (citing *Brown v. Lundell*, 162 Tex. 84, 344 S.W.2d 863, 865 (1961)).

surface directly beneath his land, together with the purposes and authority of the Department of Conservation. The Court found that traditional property concepts like trespass, must yield to the important interest of conserving the natural resources of the state. In particular, the court noted that the Commissioner is authorized to require forced pooling, even though it results in infringement of the usual rights of ownership, if he finds it necessary to prevent waste and avoid drilling unnecessary wells. The Court concluded:

[W]e hold that the more recent legislative enactments of Title 30 and Title 31 supersede in part La.Civ. Code Ann. art. 490's general concept of ownership of the subsurface by the surface owner of the land. Thus, when the Commissioner of Conservation has declared that landowners share a common interest in a reservoir of natural resources beneath their adjacent tracts, such common interest does not permit one participant to rely on a concept of individual ownership to thwart the common right to the resource as well as the important state interest in developing its resources fully and efficiently.

.        .        .        .        .

[W]e conclude that the intrusion into the subsurface two miles beneath the tract owned by Adam Nunez was an authorized unit operation. Since established private property law concepts, such as trespass, have been superseded in part by Louisiana's Conservation Law when a unit has been created by Order of the Commissioner, we do not find that a legally actionable trespass has occurred in this instance.

For similar reasons there is no legally actionable trespass in the case at bar. The Commissioner permitted the Badeaux well to be recompleted and operated as a salt water disposal well for salt water produced from the Cut Off Field. All of the salt water injected in the Badeaux well was produced from the Cut Off Field.

Underground disposal of salt water in salt water bearing formations is the "most logical and sensible solution to the problem of salt water disposal." *West Edmond Salt Water Disposal Ass'n v. Rosecrans*, 226 P.2d 965, 969 (Okla.1950). "If such disposal of salt water is forbidden unless oil producers first obtain the consent of all persons under whose lands it may migrate or percolate, underground disposal would be practically prohibited." *Id.* Certainly, it would be contrary to the interest of preventing waste and the drilling of unnecessary wells if the limited salt water bearing formations in Louisiana cannot be used to their fullest extent. If a landowner whose subsurface might be subject to invasion by salt water could preclude disposal of the salt water by withholding his consent, the operator would have to drill another disposal well in a different area, or otherwise find another method for disposal. Storage of salt water on the surface is not always environmentally safe and the cost of storage in holding tanks would make development of a formation producing a combination of salt water and oil economically unfeasible. *See Leger*, 499 So.2d at 956.

All of the salt water injected in the Badeaux well was produced from the Cut Off Field, and the operation of the well is in compliance with the Commissioner's permit.[8] Therefore, in accordance with *Nunez*, the court finds that the invasion of salt water under plaintiffs' land was part of a salt water disposal operation authorized by the Commissioner. As such, it is not unlawful and does not constitute a legally actionable trespass.

It should be noted that the court in *Nunez* does not preclude a landowner from recovering compensation for damages to his property or measurable inconvenience. *Id.* 488 So.2d at 964. Clearly, in the case at bar, the additional rentals paid to Belton Badeaux are intended to compensate him for the surface use of his property and any inconvenience caused by the disposal operations. In contrast, there is no evidence that the injection of salt water into the

8. This should not be construed as a finding that the permit was limited to the Cut Off Field.

Badeaux well causes any harm to plaintiffs. It does not damage the subsurface formations, fresh water or mineral-bearing strata, or the injection stratum itself. Plaintiffs have suffered no injury or inconvenience, either surface or subsurface.

Accordingly,

IT IS ORDERED that judgment be entered in favor of defendants and against plaintiffs, dismissing plaintiffs' suit with prejudice and costs.