# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00477-CV

**FPL Farming, Ltd., Appellant**

**v.**

**Texas Natural Resource Conservation Commission and
Environmental Processing Systems, L.C., Appellees**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. GN101481, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant FPL Farming, Ltd. appeals from a district court judgment affirming an order of the Texas Natural Resource Conservation Commission.[1] In the order, the Commission issued two amended injection well permits, allowing appellee Environmental Processing Systems, L.C. (AEPS@) to inject greater volumes of nonhazardous wastewater into a deep subsurface saltwater formation. In two issues, FPL

---

[1] By statute effective September 1, 2001, the legislature changed the name of the Texas Natural Resource Conservation Commission to the Texas Commission on Environmental Quality, to be effective January 1, 2004. The statute granted the TNRCC authority to adopt a timetable for phasing in the change of the agency=s name, so that until January 1, 2004, the agency may perform any act authorized by law under either title. *See* Act of April 20, 2001, 77th Leg., R.S., ch. 965, ' 18.01, 2001 Tex. Gen. Laws 1985. On September 1, 2002, the agency began using its new name, while continuing to recognize the former. In this opinion, we will refer to the agency as the Commission.

Farming, which owns land near EPS=s well facility, contends that the grant of the amended permits exceeded the Commission=s statutory authority and authorized an unconstitutional physical taking of its property. Finding that the Commission acted within its statutory authority and that it did not authorize an unconstitutional taking of FPL Farming=s property, we affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1996, EPS applied for permits to construct two injection wells in Liberty County that would inject commercial, nonhazardous industrial waste approximately 7,350 to 8,200 feet below the surface into the Frio saltwater formation.[2] The proposed wells were located near two tracts of land owned by FPL Farming,[3] one approximately 875 feet and the other approximately 2,000 feet from the proposed well facility. The Commission requires that injection well permit applications contain ten-year and thirty-year projections for how far injectate will migrate from a well. Here, FPL Farming as a potentially interested party received notice of the permit applications and learned that the underground waste plume from the proposed wells was projected to reach the subsurface of its closer property within ten years. FPL Farming then requested a contested case hearing in opposition to the permit applications. In September 1996, Ato avoid the delay and the expense of a hearing,@FPL Farming settled with EPS for $185,000. FPL Farming withdrew its request for a contested case hearing, and the Commission issued an order granting the permits.

---

[2] To date EPS has constructed only one of the two permitted wells.

[3] At that time, the property was owned by FPL Farming=s predecessor-in-interest, J.M. Frost, III. For convenience, we will refer to the owners collectively as FPL Farming. Neither FPL Farming nor its predecessor-in-interest has owned the oil, gas, or sulphur interests associated with the property.

In 1999, EPS filed applications to amend the permits, increasing the maximum injection rate from 96 gallons per minute to 660 gallons per minute. FPL Farming filed a request for a contested case hearing, which was held before an administrative law judge (AALJ@) at the State Office of Administrative Hearings. The ALJ who presided at the hearing and another ALJ who read the record issued a proposal for decision with proposed findings of fact and conclusions of law, recommending that the Commission issue an order granting the amendments. Included in their findings was that, assuming the maximum injection rate, the waste plume would radiate 3,021 feet from the well facility after ten years. They further concluded that FPL Farming did not have an absolute right to exclude others from the deep subsurface below its property, that it did not own the oil and gas mineral interests associated with its property, that its existing rights would not be impaired by the proposed amendments, and that operation of the wells under the amended permits would not be an unconstitutional taking. The Commission=s order, adopting the ALJs= findings of fact and conclusions of law, granted the amended permits.

FPL Farming appealed the Commission=s order to a Travis County district court, which affirmed the Commission=s actions. In two issues, FPL Farming contends that the Commission exceeded its statutory authority by improperly interpreting and applying the Injection Well Act (AAct@) and that the Commission=s grant of the amended permits causes a permanent physical invasion of FPL Farming=s property and thus is an unconstitutional taking.

4

## ANALYSIS

In its first issue, FPL Farming contends that the Commission acted outside of its statutory authority by granting the amended permit when it knew that the waste plume would migrate onto the deep subsurface of FPL Farming=s property. FPL Farming argues that the Commission improperly and unreasonably interpreted and applied the Act, contrary to its plain meaning. FPL Farming further alleges that the Commission improperly placed the burden on FPL Farming to establish impairment of its existing rights.

Statutory construction is a question of law, which we review *de novo*. *Texas Dep=t of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). **In construing these statutes, we are mindful of the rules of statutory construction. One of the cardinal rules is that we must ascertain and give effect to the legislature=s intent for the provision we are construing.** *See Fleming Foods v. Rylander*, **6 S.W.3d 278, 284 (Tex. 1999);** *Union Bankers Ins. Co. v. Shelton*, **889 S.W.2d 278, 280 (Tex. 1994);** *Calvert v. Texas Pipe Line Co.*, **517 S.W.2d 777, 780 (Tex. 1974). The legislature=s intent should be determined by reading the language used in the particular statute and construing the statute in its entirety.** *See In re Bay Area Citizens Against Lawsuit Abuse*, **982 S.W.2d 371, 380 (Tex. 1998);** *Taylor v. Firemen=s & Policemen=s Civil Serv. Comm=n*, **616 S.W.2d 187, 190 (Tex. 1981). Further, we should read every word, phrase, and expression in a statute as if it were deliberately chosen, and presume the words excluded from the statute are done so purposefully.** *See Gables Realty Ltd. P=ship v. Travis Cent. Appraisal Dist.*, **81 S.W.3d 869, 873 (Tex. App.C Austin 2002, pet. denied);** *City of Austin v. Quick*, **930 S.W.2d 678, 687**

5

**(Tex. App.**C**Austin 1996) (citing** *Cameron v. Terrell & Garrett, Inc.***, 618 S.W.2d 535, 540 (Tex. 1981)),** *aff=d***, 7 S.W.3d 109 (Tex. 1999);** *see also* **2A Norman J. Singer,** *Sutherland Statutory Construction* **' 47.25 (6th ed. 2000) (stating that there is generally an inference that omissions from a statute are intentional).**

Furthermore, we give serious consideration to an agency=s construction of a statute, as long as the construction is reasonable and does not contradict the plain language of the statute. *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993); *see Ford Motor Co. v. Motor Vehicle Bd.*, 21 S.W.3d 744, 762 (Tex. App.C Austin 2000, pet. denied). In ascertaining the scope of an agency=s authority, we give great weight to the contemporaneous construction of a statute by the administrative agency charged with its enforcement. *Tarrant Appraisal Dist.*, 845 S.W.2d at 823. We recognize that the legislature intends an agency created to centralize expertise in a certain regulatory areaAbe given a large degree of latitude in the methods it uses to accomplish its regulatory function.@ *Reliant Energy, Inc. v. Public Util. Comm=n*, 62 S.W.3d 833, 838 (Tex. App.C Austin 2001, no pet.) (citing *State v. Public Util. Comm=n*, 883 S.W.2d 190, 197 (Tex. 1994)).

We will first examine the overall scheme of the Act, which governs the issuance of injection well permits. *See* Tex. Water Code Ann.'' 27.001-.151 (West 2000 & Supp. 2003). The policies and purposes of the Act include maintaining Athe quality of fresh water in the state to the extent consistent with public health and welfare and the operation of existing industries, taking into consideration the economic development of the state, to prevent underground injection that may pollute fresh water.@ *Id.* ' 27.003 (West Supp. 2003). Under the Act, the Commission may issue an injection well permit if it finds that

$   the use or the installation of the injection well is in the public interest;

$   no *existing rights*, including, but not limited to, mineral rights, will be *impaired*; and

$   with proper safeguards, both ground and surface fresh water can be adequately protected from pollution.

*Id.* ' 27.051 (West Supp. 2003) (emphasis added). The Act does not define either Aexisting rights@ or Aimpaired.@

FPL Farming contends that the Commission improperly interpreted the Act by focusing on FPL Farming=s intended uses of the property instead of its existing property rights.[4] The Commission counters that the intent of the Act is to protect landowners=Alegitimate existing and foreseeable reasonable uses of the deep subsurface.@ It further argues that adopting FPL Farming=s interpretation would effectively ban the use of injection wells because any landowner within the projected radius of a waste plume could show impairment merely from migration onto the deep subsurface of its land.

FPL Farming further argues that the Commission incorrectly concluded that it did not have an absolute property right in the deep subsurface beneath its land, at least as deep as the level of the waste plume. Here FPL Farming invokes the *ad coelum* doctrine, an abbreviation of the maxim *cujus est solum,*

---

[4] FPL Farming also asserts that the Commission in this case is going against its own precedent from another permit application, in which it found that existing rights would not be impaired because a waste plume would not migrate onto nearby properties after ten years. *See* Tex. Natural Res. Conservation Comm=n, *Applications of Loving County Disposal, Inc.*, Permit Nos. WDW-275, WDW-276, and HW-50313-001 (Feb. 4, 1994) (final order granting permits). That case is distinguishable in that the Commission examined the possible impairment of oil and gas rights. Here, FPL Farming has no oil and gas rights and makes no claim for impairment of same.

*ejus est usque ad coelum et ad inferos*, which means that property rights extend to the sky and to the depths. *Black=s Law Dictionary* 1628 (7th ed. 1999). The Commission counters that the trend in the law is that property owners do not have the right to exclude deep subsurface migration of fluids. *See United States v. Causby*, 328 U.S. 256, 260-61 (1946) (the *ad coelum* doctrine Ahas no place in the modern world@ concerning air space); *Railroad Comm=n v. Manziel*, 361 S.W.2d 560, 568-69 (Tex. 1962) (subsurface migration of salt water in secondary recovery of natural resources was not a trespass); *see also Raymond v. Union Tex. Petroleum Corp*., 697 F. Supp. 270, 274-75 (E.D. La. 1988) (subsurface migration of salt water was not actionable without showing of harm); *Chance v. BP Chems., Inc.*, 670 N.E.2d 985, 991-92 (Ohio 1996) (subsurface rights depended on use and thus were not absolute). Assuming without deciding that FPL Farming has Aexisting rights@ in the deep subsurface beneath its land, FPL Farming=s argument then turns on whether the Commission=s grant of the amended permits caused Aimpairment@ of those existing rights.

Given that the Act does not define impairment, we will examine the ordinary meaning of the term. *See Hopkins v. Spring Indep. Sch. Dist*., 736 S.W.2d 617, 619 (Tex. 1987). To impair is to make worse; to diminish in quantity, value, excellence, or strengthC synonymous with damage or injure. *Webster=s Third New International Dictionary* 1131 (1986). FPL Farming contends that the migration of the waste plume will impair its existing rights to exclude, possess, control, and use the deep subsurface, regardless of whether it intends to exercise those rights. In essence, FPL Farming argues that a trespass alone will impair FPL Farming=s existing rights. We disagree, concluding as the ALJ did that some measure of harm must accompany the trespass for there to be impairment.

8

Although finding of fact fifty-nine stated that AFPL . . . has not identified a specific reasonable or foreseeable intended use of the deep surface where EPS=s injectate may migrate,@ the order contained the conclusion of law that A[n]o existing rights will be impaired by the construction or operation of the injection wells.@ Further, the Commission fulfilled all of the requirements of section 27.051, determining that the injection wells would be in the public interest, that no existing rights would be impaired, and that fresh water would be properly protected from pollution. *See* Tex. Water Code Ann. ' 27.051. We defer to the Commission=s interpretation because of its expertise in the geological effects of subsurface migration of injectates. *See Reliant Energy*, 62 S.W.3d at 838. Therefore, we conclude that the Commission did not improperly interpret the Act in its focus on FPL Farming=s intended uses and that this interpretation was reasonable.

The amended permits do not impair FPL Farming=s existing or intended use of the deep subsurface. An FPL Farming representative testified at the contested case hearing about possible uses:

> [ATTORNEY] Mr. Frost, let=s talk a minute about this right to exclude that you talked about earlier. What damages do you believe FPL property suffers as a result of this infringement of your right to exclude, if any?

> [MR. FROST] You know, damages are really hard to C like that are hard to quantify . . . . for example, let=s say that we wanted to produce saltwater.

> * * *

> [ATTORNEY] What other damages can you think of that would arise as a result of an infringement on this right to exclude?

> [MR. FROST] Well, let=s say that we decided that we wanted to go to the same problems of acquiring a permit to store waste on our property like y=all are doing.

9

But there is no evidence that the amended permits hamper FPL Farming=s right to use the deep subsurface in this manner. It could apply for a permit as EPS has done.

FPL Farming then asserts that the Commission improperly placed the burden on FPL Farming to demonstrate impairment of its existing rights. We disagree. In contested case hearings involving the Commission, the Aburden of proof is on the moving party by a preponderance of the evidence.@ 30 Tex. Admin. Code ' 80.17 (2000). EPS had the burden to show that its amended permits would not impair FPL Farming=s existing rights. It did so by demonstrating that its facility was in a Ageologically suitable location,@ that the location would prevent migration of fluids to an underground source of drinking water, that there would be no adverse impact on public health or the environment, that oil and gas interests in the area would not be impaired, and that the well design included proper safeguards. It was then FPL Farming=s burden to produce some evidence to refute EPS=s evidence. It failed to carry that burden.

Therefore, we hold that the Commission=s grant of the amended permits did not impair FPL Farming=s existing rights in the deep subsurface of its property and that the Commission acted within its statutory authority in granting the permits. We overrule FPL Farming=s first issue.

In its second issue, FPL Farming contends that the Commission=s grant of the amended permits is an unconstitutional physical taking by allowing the waste plume from EPS=s well facility to migrate into the subsurface of its private property. *See* U.S. Const. amend. V (prohibiting Aprivate property [to] be taken for public use without just compensation@). The Just Compensation Clause of the Fifth Amendment applies to the states through the Fourteenth Amendment. *Williamson County Planning Comm=n v.*

*Hamilton Bank*, 473 U.S. 172, 175 n.1 (1985). FPL Farming claims a physical taking, which occurs Awhen the government authorizes an unwarranted physical occupation of an individual=s property.@ *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998) (citing *Yee v. City of Escondido*, 503 U.S. 519, 522 (1992)).

A permanent physical occupation occurs when government action permanently destroys the three rights associated with the ownership of property: the power to possess, use, and dispose. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). FPL Farming argues that it has lost its right to possess the subsurface because the amended permits hamper its right to exclude EPS=s waste plume, which is projected to migrate onto its property within the next ten years. It further contends that it has lost the right to use the property because the migration of the waste plume will prevent it from engaging in a brine mining operation or constructing its own injection well. The speculative nature of FPL Farming=s plans to engage in these operations notwithstanding, FPL Farming has not demonstrated that it has been denied the opportunity to apply for a brine mining or injection well permit.[5] Furthermore, FPL Farming did not address the issue of any impairment of its right to sell its land. Therefore, FPL Farming has not met the test for a permanent physical occupation set forth in *Loretto.* 458 U.S. at 435.

FPL Farming has also not demonstrated that the granting of the amended permits constitutes a public taking. In fact, the Aissuance of a permit [under the Act] does not authorize any injury to persons or

---

[5] Brine mining also requires a permit under the Act. *See* Tex. Water Code Ann. ' ' 27.036-.037 (West 2000).

11

property or an invasion of other property rights.@ 30 Tex. Admin. Code ' 305.122(c) (2000). We recognize that A[a] compensable regulatory taking can . . . occur when governmental agencies impose restrictions that either (1) deny landowners of all economically viable use of their property, or (2) unreasonably interfere with landowners= rights to use and enjoy their property.@ *Mayhew*, 964 S.W.2d at 935 (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015-19 & n.8 (1992)). But the Commission=s grant of the amended permits to EPS does not impose such a restriction. We also note that should the waste plume migrate to the subsurface of FPL Farming=s property and cause harm, FPL Farming may seek damages from EPS. *See* Tex. Water Code Ann. ' 27.104 (West 2000) (receiving a permit does not relieve a party from civil liability). Because its takings claim must fail, we overrule FPL Farming=s second issue.

## CONCLUSION

We hold that the Commission acted within its statutory authority in granting the amended permits to EPS and that the grant of the permits did not impair FPL Farming=s existing rights in the deep subsurface of its property. We further hold that the grant of the permits was not an unconstitutional taking of FPL Farming=s property. Accordingly, we affirm the judgment of the district court in all respects.

_____

Jan P. Patterson, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed:   February 6, 2003