Judgment rendered May 21, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,287-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

| | |
|---|---|
| CHESAPEAKE LOUISIANA, L.P. AND CHESAPEAKE OPERATING, L.L.C. | Plaintiffs-Appellants |

versus

| | |
|---|---|
| BONCHASSE LAND & TIMBER, LLC, BONCHASSE LAND COMPANY, L.L.C., ULYSSES LINCOLN COLEMAN, III AS TRUSTEE OF THE COLEMAN FAMILY TRUST A AND THE COLEMAN FAMILY TRUST B, AND SEQUOIA VENTURE NO. 2, LLC | Defendants-Appellees |

* * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. 83,530

Honorable Amy Burford McCartney, Judge

* * * * *

| | |
|---|---|
| BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC | Counsel for Appellants, Chesapeake Louisiana, |
| By: Kenneth M. Klemm | LP, and Chesapeake |
| Sarah K. Casey | Operating, LLC |
| Calder H. Lamb | |
| | |
| STAMEY LAW FIRM, LLC | |
| By: Joseph Stamey | |

BRADLEY, MURCHISON,
KELLY & SHEA, LLC
By: Brittanie W. Carpenter

Counsel for Appellees,
EXCO Operating Co., LP,
and Bonchasse Land Co., LLC

DAVIDSON, SUMMERS,
HEARNE
By: Grant E. Summers
  Andrew D. Martin

Counsel for Appellees,
Bonchasse, LLC; Bonchasse
3015, LLC; Bonchasse Land &
Timber, LLC; and Ulysses
Lincoln Coleman, III as Trustee
of the Coleman Family Trust A
and Coleman Family Trust B;
and Sequoia Venture No. 2, LLC

* * * * *

Before COX, STEPHENS, and ROBINSON, JJ.

**COX, J.**

This suit arises out of the Forty-Second Judicial District Court. Chesapeake Louisiana, L.P. and Chesapeake Operating, L.L.C. (collectively, "Chesapeake") sought an injunction to prevent interference with its drilling activities. After a hearing, the trial court denied Chesapeake's permanent injunction, and Chesapeake now appeals. For the following reasons, we affirm the dissolution of the temporary restraining order ("TRO") and denial of the permanent injunction.

## FACTS

On October 26, 2022, Chesapeake filed a petition for TRO, preliminary injunction, and permanent injunctive relief against Bonchasse Land and Timber, LLC; Bonchasse Land Company, L.L.C.; Ulysses Lincoln Coleman, III, as Trustee for The Coleman Family Trust A and The Coleman Family Trust B; and Sequoia Venture No. 2, LLC, later adding Bonchasse 3015; Bonchasse, L.L.C.; and EXCO Operating Company, LP as defendants. Chesapeake argued that it was entitled to injunctive relief to prevent interference with its operations on a portion of the Defendants' property, where a well pad was to be constructed. On October 27, 2022, the district court granted the TRO and scheduled a hearing on the preliminary injunction.

The well site sits on a 230-acre tract of land in Section 24, Township 13 North, Range 14 West, in DeSoto Parish, Louisiana (the "Property"). In 2008, Anthony Mears and Vernon Mears owned 50% of the property, and Bonchasse Land Company owned the remaining 50%. On January 30, 2008, the Mears signed an oil, gas, and mineral lease ("OGML") in favor of Suncoast Land Services, who assigned the lease to Chesapeake on February 15, 2008 (hereinafter referred to as the "Chesapeake Lease"). On December

15, 2009, Bonchasse Land Company signed an OGML in favor of EXCO Operating ("EXCO Lease"); a notice of oil, gas, and mineral lease was filed in the public record. The EXCO Lease provides, "Lessee shall have no right whatsoever to conduct surface operations of any kind whatsoever on the Leased Premises[.]"

In April 2013, Bonchasse Land & Timber purchased the Mears' 50% interest in the Property. Bonchasse Land Company assigned interest in the Property to The Coleman Family Trust A, The Coleman Family Trust B, and Sequoia Venture No. 2, who assigned their interest to Bonchasse 3015 and Bonchasse, L.L.C. The Property surface is currently owned by Bonchasse Land and Timber (50%), Bonchasse 3015 (25%), and Bonchasse, L.L.C. (25%).[1]

Along with the OGMLs, Chesapeake attached emails between Tyler Goodwin, a representative of Chesapeake, and Roger Clark, a longtime employee of Mr. Coleman, regarding Property surveys for a well site and access road. Chesapeake also attached Order No. 855-E-57 from the Office of Conservation, designating cross unit wells.

The Defendants answered, clarifying that EXCO Operating now owns, controls, and manages Bonchasse Land Company. The Defendants denied that "Bonchasse has interfered with [Chesapeake's] rights in real property." They asserted that Chesapeake did not have consent from 75% of the Property owners to exercise its rights under the Chesapeake Lease. They also asserted the affirmative defenses of lack of consideration and fraud. The Defendants

_____

[1] Bonchasse 3015 and Bonchasse, L.L.C. were organized by Ulysses Lincoln Coleman, III and hereinafter referred to as the "Coleman Entities." Bonchasse Land and Timber's interest is encumbered by the Chesapeake Lease; Bonchasse 3015's and Bonchasse, L.L.C.'s interests are encumbered by the EXCO Lease.

included a reconventional demand against Chesapeake for trespass and property damage. They argued that Chesapeake made fraudulent representations to the Office of Conservation in obtaining its Order and Permit. They requested damages, including attorney fees. The Defendants included a copy of the EXCO Lease.

Chesapeake answered the Defendants' reconventional demand. Chesapeake argued that the Defendants failed to state a cause and/or right of action and denied the claims. Chesapeake asserted the following affirmative defenses: terms and conditions of the leases; Defendants have not sustained legally cognizable damages; Defendants' claims are barred by mistake or error; Defendants are not entitled to damages, costs, or attorney fees; and Chesapeake had the requisite consent to conduct operations.

On June 8, 2023, the Defendants filed a motion to dissolve the TRO, arguing that Chesapeake misstated or omitted several key facts in its petition. The Defendants included conveyance records and the filings and report of hearing from Chesapeake's permit application with the Office of Conservation. Also included in the record are letters and emails regarding the surveys and possible well site locations.

The parties agreed to multiple continuances before the injunction hearing was held on August 17, 2023, where the following testimony was presented:

Tyler Goodwin, a landman for Chesapeake, worked on the Bonchasse property project. Mr. Goodman contacted Mr. Coleman about conducting a survey on the Property. Mr. Goodman's May 4, 2022, email to Mr. Coleman includes the subject, "Chesapeake Energy Survey Permission Request: Two Proposed Drill Site Locations on Bonchasse Land & Timber Lands" and

3

states, "The purpose of this email is to request Survey Permission…Upon your review, simply reply to this email saying we have permission to begin surveying." Mr. Coleman's long time employee, Roger Clark, emailed Mr. Goodwin an aerial map with an approved well site "per the EXCO agreement," and excerpts from the EXCO agreement defining the approved well site and easements. Mr. Goodwin testified that the well site provided by Mr. Clark was not suitable for Chesapeake. Mr. Clark gave permission for Chesapeake to survey the property for a proposed well site and access road.

In June of 2022, Chesapeake filed its permit application with the Louisiana Office of Conservation for three cross unit horizontal wells in the HA RA SUR and HA RA SUZ units and a proposed well site situated on the Property. Mr. Clark testified that upon receiving the pre-application notice, he contacted Onebane Law Firm, who prepared the notice. A representative at Onebane Law Firm told him, "These are usually preliminary drawings from the geologist or from whoever prepares this, and they don't necessarily mean that that's where the wells are going to actually be drilled as far as surface sites." Mr. Clark also called the geologist who drew the plat, who confirmed what he was told by Onebane Law Firm and stated that "a lot of times the operator hasn't even determined yet where the wells will be drilled."

On July 9, 2022, Mr. Goodwin emailed Mr. Clark to state that the survey crew would be working on July 11 on an access road and drilling site. On August 2, 2022, Mr. Goodwin emailed Mr. Coleman and Mr. Clark stating, "Several of Chesapeake's drilling plans have been altered and I believe we are ready to begin the acquisition process for this Drill Site and Access Road." Mr. Goodwin attached the proposed surface lease agreement, plats, and an aerial map. The Office of Conservation hearing was held on

4

August 16, 2022, the Property owners were not present, and no one objected. Chesapeake was issued Order No. 855-E-57, effective August 16, 2022, approving the application.

On August 17, 2022, Mr. Goodwin emailed Mr. Coleman and Mr. Clark to follow up about the "Drill Site Proposal," and stated that Chesapeake would need to begin construction in the next six weeks to stay on schedule. On August 18, 2022, Mr. Clark responded that he was checking for questions. Mr. Goodwin sent another email on August 29, 2022, requesting an update. Mr. Clark responded, "We are reviewing the surface lease and other information you previously provided and I hope to get back with you very soon." On September 27, 2022, Mr. Goodwin sent a letter to Bonchasse Land and Timber stating that Chesapeake "is set to commence operations on the BLT tract for the constructing of an Access Road & Drill Site" pursuant to the authority granted in Order No. 855-E-57 and the right under the Chesapeake Lease. In response to the letter, Mr. James Womack, another employee of Mr. Coleman, emailed Mr. Goodwin another copy of the approved drill site per the EXCO agreement. Mr. Goodwin testified that he never heard back from the Coleman Entities regarding the surface-use proposal.

On October 6, 2022, the Office of Conservation issued three drilling permits to Chesapeake to drill on the Property after Chesapeake certified that "a contractual relationship presently exists between the operator and the surface owner(s) of the subject well." On October 12, 2022, Mr. Womack suggested alternative well sites to Mr. Goodwin. Mr. Goodwin responded that his team had already explored every possibility, and relocation was not an option in order to maintain the current drill schedule. On October 20, 2022, Mr. Clark emailed Mr. Goodwin asking why the survey crew was back at the

5

Property. Mr. Goodwin responded, "The surveyors were re-locating the Access Road at the request of DOTD. They were also re-staking the Drill Site and Access Road so Construction can begin moving in equipment today. I should have an updated plat for you reflecting the Access Road change. As always we will be happy to continue to work with you and your team on a Surface Use Agreement."

On October 21, 2022, Chesapeake began construction on the access road. Mr. Clark stated in his October 21, 2022, email, "As I mentioned last night and in prior communication, Chesapeake has no authorization or approvals to begin construction of either the access road or the well pad. Chesapeake must cease and desist any activity at the property immediately at such time as ownership does approve a location for any work to be done whether an access road or well pad." Mr. Clark was referred to Chesapeake's legal department for further communications. Chesapeake informed Mr. Clark that it was their position that the law did not require the Property owners' approvals because of the Chesapeake Lease, Order from the Office of Conservation, and "applicable law." On December 6, 2022, EXCO notified Chesapeake of its election to participate in the wells pursuant to La. R.S. 30:10(A).

The parties filed post-hearing briefs. On May 29, 2024, the trial court filed its 24-page written reasons for ruling. The trial court detailed the procedural and factual history of the suit before commencing with the legal analysis. The trial court found that no contractual relationship existed between Chesapeake and Bonchasse, LLC or Bonchasse 3015, LLC and distinguished the case from *Nunez v. Wainoco Oil & Gas Co.*, 488 So. 2d 955 (La. 1986) ("*Nunez I*") and *Nunez v. Wainoco Oil & Gas Co.*, 606 So. 2d

6

1320 (La. App. 3 Cir. 1992), *writ denied*, 608 So. 2d 1010 (La. 1992) ("*Nunez II*").

The trial court's judgment was signed on June 20, 2024, in which the trial court denied Chesapeake's preliminary injunction and granted the Defendants' motion to dissolve the TRO.

Chesapeake now appeals.

## DISCUSSION

*Application of Nunez I and Nunez II*

Chesapeake argues that the trial court committed legal error in finding that *Nunez I* and *Nunez II* did not entitle Chesapeake to operate on the Property irrespective of the consent requirement in Section 31:166.

Louisiana Code of Civil Procedure Article 3601(A) states, "An injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law[.]" A trial court may grant a preliminary injunction where a party makes a showing of three things: (1) that the injury, loss or damage he will suffer if the injunction is not issued may be irreparable; (2) that he is entitled to the relief sought; and (3) that he is likely to prevail on the merits of the case. *Branch Properties, L.L.C. v. Doctor's Point Dev., L.L.C.*, 52,687 (La. App. 2 Cir. 5/22/19), 273 So. 3d 573.

The grant or denial of a preliminary injunction is left to the sound discretion of the trial court and will not be disturbed on appeal except for a clear abuse of that discretion. *Id*.

*Nunez I* concerned an underground trespass of a wellbore within a unit in which the plaintiff participated. The *Nunez I* court cited La. R.S. 30:204(F), repealed in 1997 and now embodied in La. R.S. 30:28(F). La. R.S.

7

30:28(F) provides in part, "The issuance of the permit by commissioner of conservation shall be sufficient authorization to the holder of the permit to enter upon the property covered by the permit and to drill in search of minerals thereon." The *Nunez I* court concluded "the established principles of private ownership, already found inadequate in Louisiana to deal with the problems of subsurface fugacious minerals, need not necessarily be applied to other property concepts, like trespass, with a unit created by the Department of Conservation." (citations omitted). The court highlighted that the case involved the intrusion of a wellbore two miles below the surface of the plaintiff's tract, not a well located on the surface of a tract without the owner's consent. The *Nunez I* court concluded "that the intrusion into the subsurface two miles beneath the tract owned by [the plaintiff] was an authorized unit operation. Since established private property law concepts, such as trespass, have been superseded in part by Louisiana's Conservation Law when a unit has been created by order of the Commissioner, we do not find that a legally actionable trespass has occurred in this instance."

We find *Nunez I* distinguishable from the instant case. *Nunez I* involved a subsurface trespass of a surface owner's property; the case before us involves a surface well site with multiple wells. Additionally, in *Nunez I*, the well location was considered an optimum location. In the instant case, the hearing on August 16, 2022, at the Office of Conservation did not involve a discussion as to the optimum well location.

Mr. Comeaux testified that he was hired by Chesapeake to get the drilling permit approved. In his testimony at the Office of Conservation hearing, he testified as to the need for drilling these units in order to "efficiently and economically drain a portion of the Haynesville zone

8

underlying the subject units which cannot be so drained by an existing well[.]" Mr. Comeaux testified that his role at the Office of Conservation hearing was to testify as to the slots depicted on the permit plat; he does not give an opinion as to the well's surface location. He described those slots as locations where the operator wants to drill, which can be accessed by multiple surface locations. When asked why landowners will call him concerning the plats that are mailed out, he stated the following:

> The slots are shown on a map and a 2-D scale, a planned view. And some people believe that the well is shown across their property, so they're saying, "Well, it's going to be drilled on my property." I presume, most of the time, they're thinking it's on the surface of their property when in reality it's two miles under the earth. You know, it's a depiction on a planned view to try and show where the wells are going to be drilled or the slots are going to be drilled.

Mr. Comeaux did not recall a conversation with a representative of the Coleman entities, but he did have a piece of paper in his folder stating that he received a phone call from someone named Coleman or associated with Coleman.

Mr. Comeaux stated that he did not believe the application requested the Office of Conservation to approve the surface. He testified that in his experience, the Office of Conservation relies on information from the operator and does not check over contracts or property titles to verify what the operator has requested.

*Nunez I* does not involve a misrepresentation to the Office of Conservation. In the case before us, Chesapeake checked the Affidavit of Compliance box which stated, "A contractual relationship presently exists between the operator and surface owner(s) of the subject well. As such, no pre-entry notice is required pursuant to 30:28(I)(1)(c)." Chesapeake admitted

9

that it was aware that it did not have a lease over 100 percent of the Bonchasse Tract. However, Chesapeake did not check the box which stated, "Surface owner was provided pre-entry notice on the __ day of __, 20__. No construction operations of a drilling location for the aforementioned well shall commence less than thirty (30) days after such date." We find no error in the trial court's finding that Chesapeake misrepresented its drilling project to the Office of Conservation, as it did not have a contractual relationship with half of the surface owners to drill on the property. We find *Nunez I* to be distinguishable and not applicable to this case.

*Nunez II* involved a temporary encroachment on the plaintiff's property while the well was being drilled. The drilling company placed a mud pit, ring levee, water pit, water well, machinery, pipe, board road, derrick, and other equipment necessary for drilling on the plaintiff's property. The actual well was not located on the plaintiff's property, and the property was restored. We agree with the trial court that *Nunez II* is distinguishable from the facts of this case and does not apply.

We do not agree with Chesapeake that the trial court committed legal error in distinguishing *Nunez I* and *Nunez II*. The trial court did not abuse its discretion in ruling that Chesapeake did not prove irreparable harm; that it is entitled to the relief sought; and that it is likely to prevail on the merits of the case. We affirm the denial of the preliminary injunction.

*Consent Requirement*

Chesapeake asserts that the trial court committed manifest error in finding that it failed to comply with the consent requirement of Section 31:166. Chesapeake asserts that the Coleman Entities tacitly consented to its operations on the Property, as provided for in La. C.C. art. 1927.

10

A contract is formed by the consent of the parties established through offer and acceptance. Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent. La. C.C. art. 1927. The determination of the existence of a contract is a finding of fact, not to be disturbed unless clearly wrong. *Dubois Const. Co. v. Moncla Const. Co., Inc.*, 39,794 (La. App. 2 Cir. 6/29/05), 907 So. 2d 855.

At the time of surveying and drilling, La. R.S. 31:166 provided:

A co-owner of land may grant a valid mineral lease or a valid lease or permit for geological surveys, by means of a torsion balance, seismographic explosions, mechanical device, or any other method as to his undivided interest in the land but the lessee or permittee may not exercise his rights thereunder without consent of co-owners owning at least an undivided seventy-five percent interest in the land, provided that he has made every effort to contact such co-owners and, if contacted, has offered to contract with them on substantially the same basis that he has contracted with another co-owner. A co-owner of the land who does not consent to the exercise of such rights has no liability for the costs of development and operations or other costs, except out of his share of production.

Under La. R.S. 31:166, Chesapeake was not permitted to exercise its rights under the Chesapeake Lease without at least 75% of the co-owners' consent. Chesapeake only had 50% from its lease. Chesapeake acknowledges the relevance of La. R.S. 31:166 but asserts that it does not require the non-leasing owners to consent to every aspect of the operator's plans.

Chesapeake asserts that the Coleman Entities tacitly consented by the following: expressly consenting to the surveying; not objecting until October 21, 2022; proposing revisions to the access road; and engaging with Chesapeake regarding proposed operations. We disagree.

11

In order to have a contract, there must be an offer and acceptance. It is undisputed that the Coleman Entities consented to the survey; however, the Coleman Entities never accepted Chesapeake's offer for a surface location. The Coleman Entities made counteroffers, but the counteroffers were rejected by Chesapeake. Mr. Clark testified that he called both the geologist and law firm listed on the hearing notice, and both told him that the surface sites depicted on the plat were preliminary. Mr. Comeaux could not refute this statement; he testified that he had a note about a Coleman calling him but could not recall the conversation. Mr. Clark also testified that he did not convey consent on behalf of the Coleman Entities, and he believed negotiations were ongoing. Based on the testimony and evidence, the trial court was not clearly wrong in determining that the Coleman Entities did not consent to the surface site on their property. Therefore, Chesapeake did not have the requisite 75% consent under La. R.S. 31:166. We affirm the trial court's denial of Chesapeake's preliminary injunction and dissolution of the TRO.

## CONCLUSION

For the reasons outlined above, we affirm the trial court's judgment. All costs associated with this appeal are cast on Chesapeake.

**AFFIRMED.**